## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Computer Forensic Services, Inc., and 360 Security Services, LLC,

      Plaintiffs,

vs.

BraunHagey & Borden LLC,

      Defendant,

Case No.: 22-cv-02665

Date Complaint filed: Aug. 16, 2022

**DEFENDANT BRAUNHAGEY & BORDEN LLP's ANSWER TO COMPLAINT AND COUNTERCLAIM**

---

Defendant BraunHagey & Borden LLP, improperly sued as BraunHagey & Borden LLC (BHB), counterclaims against Plaintiffs Computer Forensic Services, LLC and 360 Security Services, LLC (CFS); and for its Answer, denies every allegation in the Complaint unless specifically admitted in this Answer.

### COUNTERCLAIM

For its counterclaims against CFS, BHB states and alleges as follows:

### FACTS

1.    BHB is a law firm appointed to represent a proposed consumer class in the pending lawsuit *Spectrum Scientifics v. Celestron*, Case No. 5:20-cv-03642-EJD (N.D. Cal.) ("the *Spectrum* litigation"). As appointed counsel to the proposed consumer class, BHB has a fiduciary duty to limit the class's costs and maximize its recovery.

2.    BHB retained CFS on June 1, 2021 to recover information from electronic sources and to scan physical documents related to the *Spectrum* litigation. The parties entered into a written agreement. A true and correct copy of the agreement (contract) is attached as Exhibit A.

3.    The contract provides this regarding preservation (Ex. A at 2.):

Preservation Fees: CFS charges a flat fee for the forensic preservation of digital media/electronic devices. Preservation includes the creation of a proprietary forensically sound bit-stream forensic image, and verification. The flat fee amount is dependent upon the media type and size. A brief listing of current preservation rates are as follows: for computer/laptop hard drives, $300-$750 per device, and for mobile devices (smartphones, tablets, etc.), $575 per device.

4.    The contract provides this regarding data hosting: "Data hosting may be terminated at any time after the start of data hosting invoicing." (Ex. A at 2.)

5.    BHB identified 20 electronic documents for forensic preservation. A CFS employee picked up the devices from BHB's clients. CFS successfully extracted data from 12 of the 20 electronic devices. CFS also identified paper documents, which CFS scanned and produced to BHB.

6.    On July 7, 2021, BHB received invoices from CFS for $24,754.80 and $8,072.50.

7.    On July 22, 2021, BHB emailed CFS regarding the July 7 invoices:

Our accounting department will not process this without significantly more detail. In particular, for the approximately 51 hours identified as "Analysis," we will need to know what was done and on what devices.  Fifty-one hours also seems like a lot of time for analysis on these drives, particularly since many of the devices were apparently beyond their usable life and did not have any recoverable data, so we will need more substantiation about the work performed.

8.    BHB discovered that CFS was attempting to bill BHB for the many hours that its computers were processing data as "forensic analyst time."

9.    In September 2021, at BHB's direction, CFS transferred the 12 devices that CFS had unsuccessfully attempted to recover data from to a vendor of BHB's choosing. The vendor successfully recovered the data, while billing only a fraction of the time and money that CFS did.

10.  On September 23, 2021, CFS emailed BHB the invoices to date, which were for $292.50, $8,072.50, and $24,754.80. In the email, CFS stated:

> Please note that CFS continues to host a significant amount of data (the forensic images) on this project. We will need to begin billing for this hosting starting Oct. 1, 2021. We can either delete the images from our servers, or we can host the data at $3.45 per GB per month. It's my understanding that productions were already made to your Relativity provider, but CFS has not been authorized to destroy the images.

11.  Beginning on October 1, 2021, without BHB's knowledge or consent, CFS began live-hosting the data rather than preserving it.

12.  In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

13.  On November 9, 2021, Mark Lanterman emailed a letter to Ron Fisher. A true and correct copy of the letter is attached as Exhibit B. In the letter, Mr. Lanterman admitted that CFS was in direct communication with BHB's clients regarding the data, asserted that CFS is "no [sic] longer bound by any confidentiality obligation," and stated that CFS "consider[s] all property in our possession abandoned and will dispose of it as appropriate." (Ex. B.)

14.  On November 17, 2021, Mr. Fisher sent an email responding to Mr. Lanterman's November 7 letter. The email reiterated that CFS had actual knowledge that the data are evidence relevant to pending proceedings in a federal court. BHB asserts and affirmatively alleges that Mr. Fisher stated in this email that CFS would incur considerable risk if CFS destroy or spoliated the data, but that BHB could make necessary arrangements to receive the data if CFS would return it.

15. On November 17, 2021, Mr. Fisher was contacted by Nancy M. Vold from the James H. Gilbert Law Group, PLLC informing him that Mr. Lanterman had contacted their office about an arbitration. Mr. Fisher responded, indicating that no such arbitration agreement had been reached.

16. On May 31, 2022, CFS again attempted to bring an arbitration, this time before JAMS. CFS's arbitration demand is attached as Exhibit C. Mr. Fisher again objected. On July 11, 2022, JAMS concluded that it could not "proceed with this matter" in "light of the parties' contract and BHB's "objection to JAMS administration…"

17. In July and August 2022, the parties' counsel discussed various matters related to the dispute, including potential arbitrators, and the return of the data. The email communications between the parties' counsel are attached as Exhibit D. Notably, BHB's counsel asked three separate times for the data of BHB's clients to be returned, but CFS refused to do so.

18. According to CFS, it intends to invoice BHB for data-hosting charges totaling $84,882.82, covering October 1, 2021, to May 24, 2022—and it will continue to bill for this live-hosting indefinitely. BHB's numerous requests that CFS simply preserve the data—rather than live-hosting the data—or return the data have gone unanswered.

19. CFS's unfair and aggressive billing practices and extortionate threats to abuse data in its possession unless CFS's demands are met are part of a pattern, practice, and policy of CFS.

20. For example, in 2013, CFS overbilled another attorney for forensic services in connection with an internal investigation.

21. When that attorney refused to pay CFS's improper demands, CFS and its principal, Mark Lanterman, threatened to conduct "a public auction of [the collected] data."

22. When the attorney warned that Mr. Lanterman's threatened course of action was potentially criminal, Mr. Lanterman doubled-down on his threat, stating he had "no choice but to move forward with a lien and public auction."

23. Mr. Lanterman further threatened that this action would make public aspects of the confidential internal investigation for which CFS was engaged to forensically collect data.

24. Thus, Mr. Lanterman and CFS's overbilling of BHB and subsequent threats to destroy evidence is not just a one-off event. Rather, Mr. Lanterman and CFS intentionally and improperly leverage their access to sensitive, confidential, and privileged data to attempt to extort improper payments from unsuspecting clients.

As a result of the foregoing, BHB has incurred, and will continue to incur, damages as a direct result of CFS' actions.

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT**

25. BHB restates and realleges all the preceding paragraphs as though set forth here.

26. Under the contract, CFS agreed to obtain information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence will be preserved, using reasonable care and in compliance with industry standards, and in compliance with all applicable laws and regulations.

27. CFS attempted to bill BHB for many hours that its computers were processing data as "forensic analyst time." Billing computer time as analyst time is not industry standard, and the contract provides for payment for actual analyst time, not computer time.

28. Beginning on October 1, 2021, without BHB's knowledge or consent, and in violation of the contract, CFS began live-hosting the data rather than preserving it. CFS then threatened to destroy the evidence unless BHB paid the live-hosting fees.

29. In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

30. According to CFS, it intends to invoice BHB for data-hosting charges totaling $84,882.82, covering October 1, 2021, to May 24, 2022—and it will continue to bill for this live-hosting indefinitely. BHB's numerous requests that CFS simply preserve the data—rather than live-hosting the data—or return the data have gone unanswered.

31. CFS's billing of computer time as analyst time, and billing for live-hosting of data instead of simply preserving the data, are part of a pattern, practice, and policy of CFS.

32. In so doing, CFS failed to use reasonable care by complying with the standards of the industry, failed to satisfy its obligations, duties and terms of the contract between the parties, and violated applicable laws and regulations. This breaches the contract.

33. As a result of this breach, BHB has incurred damages in excess of $50,000, the exact amount to be determined.

## SECOND CLAIM FOR RELIEF
## UNJUST ENRICHMENT

34. BHB restates and realleges all the preceding paragraphs as though set forth here.

35. CFS attempted to bill BHB for many hours that its computers were processing data as "forensic analyst time." Billing computer time as analyst time is not industry standard, and the contract provides for payment for actual analyst time, not computer time.

36. Beginning on October 1, 2021, without BHB's knowledge or consent, and in violation of the contract, CFS began live-hosting the data rather than preserving it. CFS threatened to destroy the evidence unless BHB paid the live-hosting fees.

37. In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

38. According to CFS, it intends to invoice BHB for data-hosting charges totaling $84,882.82, covering October 1, 2021, to May 24, 2022—and it will continue to bill for this live-hosting indefinitely. BHB's numerous requests that CFS simply preserve the data—rather than live-hosting the data—or return the data have gone unanswered.

39. CFS's billing of computer time as analyst time, and billing for live-hosting of data instead of simply preserving the data, are part of a pattern, practice, and policy of CFS.

40. Because it would be unjust for CFS to retain the data belonging to BHB and its clients, the proposed consumer class in the *Spectrum* litigation, CFS has been unjustly enriched by more than $100,000, the exact amount to be determined.

### THIRD CLAIM FOR RELIEF
### FRAUD

41. BHB restates and realleges all the preceding paragraphs as though set forth here.

42. Under the contract, CFS agreed to obtain information from electronic and physical (paper) sources related to the *Spectrum* litigation, using reasonable care and in compliance with industry standards, and in compliance with all applicable laws and regulations.

43. The contract provided that CFS would act to further BHB's duty to preserve evidence in the *Spectrum* litigation by obtaining information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence will be preserved.

44. CFS attempted to bill BHB for many hours that its computers were processing data as "forensic analyst time." Billing computer time as analyst time is not industry standard, and the contract provides for payment for actual analyst time, not computer time.

45. Beginning on October 1, 2021, without BHB's knowledge or consent, and in violation of the contract, CFS began live-hosting the data rather than preserving it. CFS threatened to destroy the evidence unless BHB paid the live-hosting fees.

46. CFS's billing of computer time as analyst time, and billing for live-hosting of data instead of simply preserving the data or returning the data, are part of a pattern, practice, and policy of CFS.

47. In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

48. BHB justifiably relied on this CFS's false representation that it would use reasonable care and comply with industry standards and comply with all applicable laws and regulations.

49. As a result of the false representation, BHB has incurred damages in excess of $50,000, the exact amount to be determined.

## FOURTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION

50. BHB restates and realleges all the preceding paragraphs as though set forth here.

51. Under the contract, CFS agreed to obtain information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence be preserved, using reasonable care and in compliance with industry standards, and in compliance with all applicable laws and regulations.

52. The contract provided that CFS would act to further BHB's duty to preserve evidence in the *Spectrum* litigation by obtaining information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence be preserved.

53. CFS attempted to bill BHB for many hours that its computers were processing data as "forensic analyst time." Billing computer time as analyst time is not industry standard, and the contract provides for payment for actual analyst time, not computer time.

54. Beginning on October 1, 2021, without BHB's knowledge or consent, and in violation of the contract, CFS began live-hosting the data rather than preserving it. CFS threatened to destroy the evidence unless BHB paid the live-hosting fees.

55. CFS's billing of computer time as analyst time, and billing for live-hosting of data instead of simply preserving the data or returning the data, are part of a pattern, practice, and policy of CFS.

56. In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

57. BHB justifiably relied on CFS's misrepresentation that it would use reasonable care and comply with industry standards and comply with all applicable laws and regulations.

58. As a result of the misrepresentation, BHB has incurred damages in excess of $50,000, the exact amount to be determined.

**FIFTH CLAIM FOR RELIEF**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

59. BHB restates and realleges all the preceding paragraphs as though set forth here.

60. CFS had a duty to act in good faith to obtain information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence be preserved, using reasonable care and in compliance with industry standards, and in compliance with all applicable laws and regulations.

61. CFS attempted to bill BHB for many hours that its computers were processing data as "forensic analyst time." Billing computer time as analyst time is not industry

standard, and the contract provides for payment for actual analyst time, not computer time.

62. Beginning on October 1, 2021, without BHB's knowledge or consent, and in violation of the contract, CFS began live-hosting the data rather than preserving it. CFS threatened to destroy the evidence unless BHB paid the live-hosting fees.

63. CFS's billing of computer time as analyst time, and billing for live-hosting of data instead of simply preserving the data or returning the data, are part of a pattern, practice, and policy of CFS.

64. In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

65. In so doing, CFS failed to act in good faith to honestly obtain information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence be preserved, and also failed to act in good faith by unjustifiably hindering BHB's performance of its contractual obligation to its clients in the *Spectrum* litigation.

66. As a result of this breach, BHB has incurred damages in excess of $50,000, the exact amount to be determined.

**SIXTH CLAIM FOR RELIEF**
**NEGLIGENCE**

67. BHB restates and realleges all the preceding paragraphs as though set forth here.

68. CFS owed BHB a duty to obtain information from electronic and physical (paper) sources related to the *Spectrum* litigation, using reasonable care and in

compliance with industry standards, and in compliance with all applicable laws and regulations.

69. CFS also owed BHB a duty to preserve evidence in the *Spectrum* litigation by obtaining information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence will be preserved.

70. CFS attempted to bill BHB for many hours that its computers were processing data as "forensic analyst time." Billing computer time as analyst time is not industry standard, and the contract provides for payment for actual analyst time, not computer time

71. Beginning on October 1, 2021, without BHB's knowledge or consent, and in violation of the contract, CFS began live-hosting the data rather than preserving it. CFS threatened to destroy the evidence unless BHB paid the live-hosting fees.

72. CFS's billing of computer time as analyst time, and billing for live-hosting of data instead of simply preserving the data or returning the data, are part of a pattern, practice, and policy of CFS.

73. In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

74. As a direct and proximate result of CFS's negligence, BHB has incurred damages in excess of $50,000, the exact amount to be determined.

**SEVENTH CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTY**

75. BHB restates and realleges all the preceding paragraphs as though set forth here.

76. CFS had a fiduciary relationship with BHB, in which BHB necessarily placed trust and confidence in CFS's purported superior knowledge and experience with forensic preservation.

77. BHB is a law firm appointed to represent a proposed consumer class in the pending the *Spectrum* litigation. As appointed counsel to the proposed consumer class, BHB has a fiduciary duty to limit the class's costs and maximize its recovery. BHB also has a contractual relationship with the proposed consumer class.

78. CFS knew about BHB's contractual relationship with the proposed consumer class.

79. Under the contract, CFS agreed to obtain information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence will be preserved, using reasonable care and in compliance with industry standards, and in compliance with all applicable laws and regulations.

80. CFS attempted to bill BHB for many hours that its computers were processing data as "forensic analyst time." Billing computer time as analyst time is not industry standard, and the contract provides for payment for actual analyst time, not computer time.

81. Beginning on October 1, 2021, without BHB's knowledge or consent, and in violation of the contract, CFS began live-hosting the data rather than preserving it or returning it. CFS threatened to destroy the evidence unless BHB paid the live-hosting fees.

82. CFS's billing of computer time as analyst time, and billing for live-hosting of data instead of simply preserving the data or returning the data, are part of a pattern, practice, and policy of CFS.

83. In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

84. In so doing, CFS breached its fiduciary duty to BHB and its clients, the proposed consumer class in the *Spectrum* litigation, who have incurred damages in excess of $50,000, the exact amount to be determined.

85. As a result of this breach, BHB has incurred damages in excess of $50,000, the exact amount to be determined.

## EIGHTH CLAIM FOR RELIEF
## FRAUD, MISREPRESENTATION, AND DECEPTIVE PRACTICES
### (Minn. Stat. § 325F.68, *et seq.* and Minn. Stat. § 325D.13, *et seq.*)

86. BHB restates and realleges all the preceding paragraphs as though set forth here.

87. Minnesota's Private Attorney General Statute (Minn. Stat.§ 8.31, subd. 3a) allows BHB to bring a claim under Minnesota Statutes, section 325F.69 and section 325D.13, *et seq.* CFS advertised and represented to BHB, its clients, and the public that it conducted its forensic services in a manner that ensures that evidence be preserved, using reasonable care and in compliance with industry standards, and in compliance with all applicable laws and regulations. BHB's claims inure to the public benefit.

88. CFS is a manufacturer, marketer, seller, and distributor of forensic services.

89. BHB is protected by the Unlawful Trade Practices Act because, among other things, BHB purchased CFS's forensic services in connection with the *Spectrum* litigation venued in Minnesota.

90. CFS's advertisements and representations regarding its forensic services were made in connection with its contract with BHB.

91. CFS intentionally misrepresented, knowingly misrepresented, or both, how it truly conducted forensic services to BHB, its clients, and the public.

92. CFS's methods of competition and unfair or deceptive acts or practices were likely to deceive reasonable customers about CFS's forensic services. BHB and its clients, relied on, and were in fact deceived by, CFS's advertisements, representations, misrepresentations, concealment, and omissions—which CFS intended that BHB and its clients would rely on—regarding its forensic services in deciding to choose CFS over its competitors.

93. Had BHB and its clients been aware of CFS's true forensic practices, they would have either negotiated different terms, or would not have chosen CFS at all.

94. Under the contract, CFS agreed to obtain information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence be preserved, using reasonable care and in compliance with industry standards, and in compliance with all applicable laws and regulations.

95. The contract provided that CFS would act to further BHB's duty to preserve evidence in the *Spectrum* litigation by obtaining information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence be preserved.

96. CFS attempted to bill BHB for many hours that its computers were processing data as "forensic analyst time." Billing computer time as analyst time is not industry standard, and the contract provides for payment for actual analyst time, not computer time.

97. Beginning on October 1, 2021, without BHB's knowledge or consent, and in violation of the contract, CFS began live-hosting the data rather than preserving it or returning it. CFS threatened to destroy the evidence unless BHB paid the live-hosting fees.

98. CFS's billing of computer time as analyst time, and billing for live-hosting of data instead of simply preserving the data, are part of a pattern, practice, and policy of CFS. The pattern, practice, and policy occurs repeatedly in CFS's business, and is capable of deceiving a substantial portion of the public. CFS's unlawful conduct is continuing, with no indication that CFS intends to cease. And the facts concealed or not disclosed by CFS were material facts because BHB, its clients, and any reasonable customer would have considered them in decided whether to choose CFS to provide forensic services.

99. In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

100. BHB and its clients in the *Spectrum* litigation relied on CFS's fraudulent statements, misrepresentations, and deceptive practices in retaining CFS to obtain information from electronic and physical (paper) sources related to the *Spectrum* litigation—and then ensuring that this evidence be preserved, using reasonable care and

in compliance with industry standards, and in compliance with all applicable laws and regulations.

101.   As a result of these fraudulent statements, misrepresentations, and deceptive practices, BHB and its clients, the proposed consumer class in the *Spectrum* litigation, have incurred damages in excess of $100,000, the exact amount to be determined by this Court.

## NINTH CLAIM FOR RELIEF
## CONVERSION

102.   BHB restates and realleges all the preceding paragraphs as though set forth here.

103.   Beginning on October 1, 2021, without BHB's knowledge or consent, and in violation of the contract, CFS began live-hosting the data rather than preserving it. CFS threatened to destroy the evidence unless BHB paid the live-hosting fees.

104.   In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

105.   CFS willfully interfered with the personal property of BHB's clients in the *Spectrum* litigation, had no lawful justification for doing so, and this personal property remains unavailable to BHB.

106.   As a result of this conversion, BHB and its clients, the proposed consumer class in the *Spectrum* litigation, have incurred damages in excess of $100,000, the exact amount to be determined by this Court.

**TENTH CLAIM FOR RELIEF**
**REPLEVIN**

107.    BHB restates and realleges all the preceding paragraphs as though set forth here.

108.    Beginning on October 1, 2021, without BHB's knowledge or consent, and in violation of the contract, CFS began live-hosting the data rather than preserving it. CFS threatened to destroy the evidence unless BHB paid the live-hosting fees.

109.    In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made.

110.    CFS willfully interfered with the personal property of BHB's clients in the *Spectrum* litigation, had no lawful justification for doing so, and this personal property remains unavailable to BHB.

111.    As a result of these conversional acts, BHB and its clients, the proposed consumer class in the *Spectrum* litigation, will suffer irreparable harm unless this Court orders that CFS return of all BHB's clients' personal property.

**ANSWER**

**INTRODUCTION**

1.    BHB denies the allegations in Paragraph 1.

2.    BHB admits the allegations in Paragraph 2.

3.    BHB admits the allegations in Paragraph 3.

4.    Regarding the allegations in Paragraph 4, BHB admits that to obtain information from electronic and physical (paper) sources related to the *Spectrum*

litigation, BHB retained CFS on June 1, 2021. The parties entered into a written agreement. BHB denies the remaining allegations in Paragraph 4.

5.    Regarding the allegations in Paragraph 5, BHB admits that most of this invoice appears to be based on a 20-cent per page flat rate. BHB denies the remaining allegations in Paragraph 5.

6.    Regarding the allegations in Paragraph 6, BHB admits that to obtain information from electronic and physical (paper) sources related to the *Spectrum* litigation, BHB retained CFS on June 1, 2021. The parties entered into a written agreement. BHB further admits that it identified 20 electronic documents for forensic preservation. A CFS employee picked up the devices from BHB's clients. BHB denies the remaining allegations in Paragraph 6.

7.    Regarding the allegations in Paragraph 7, BHB admits that CFS provided some of the data it gathered to another of BHB's vendors. BHB lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 7, and therefore denies them.

8.    Regarding the allegations in Paragraph 8, BHB admits that it is BHB's position that CFS tried to bill BHB for many hours that its computers were processing data as "forensic analyst time." Billing computer time as analyst time is not industry standard, and the contract provides for payment for actual analyst time, not computer time. BHB has tendered the $9,96.60 to CFS for paper scanning services. BHB denies the remaining allegations in Paragraph 8.

9.    BHB denies the allegations in Paragraph 9.

10. Regarding the allegations in Paragraph 10, BHB admits that CFS seeks damages, attorneys' fees, and for time and expenses related to this dispute, including for non-attorneys' fees. The rest of Paragraph 10 sets forth a legal conclusion to which no response is required.

11. Regarding the allegations in Paragraph 11, BHB admits the Complaint seeks to compel arbitration, or in the alternative, a jury trial. BHB denies that it failed to cooperate with the election of an arbitrator or venue at any time. The remaining allegations in Paragraph 11 set forth a legal conclusion to which no response is required.

## PARTIES

12. BHB admits that Computer Forensic Services, LLC is a Minnesota limited liability corporation with a principal place of 800 Hennepin Ave., Fifth Floor, Minneapolis, Minnesota 55403. BHB admits that Computer Forensic Services, LLC purports to provide many services. BHB denies the remaining allegations in Paragraph 12.

13. BHB admits that 360 Security Services, LLC is a Minnesota limited liability corporation with a principal place of 800 Hennepin Ave., Fifth Floor, Minneapolis, Minnesota 55403. BHB admits that 360 Security Services, LLC purports to provide many services. BHB denies the remaining allegations in Paragraph 13.

14. BMB lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14, and therefore denies them.

15. BHB admits the allegations in Paragraph 15.

## JURISDICTION AND VENUE

16. Paragraph 16 sets forth legal conclusions to which no response is required. To the extent a response is required, BHB denies them.

17. Paragraph 17 sets forth legal conclusions to which no response is required. To the extent a response is required, BHB denies them.

## AGREEMENT TO ARBITRATE

18. BHB admits that the "relevant part" of the "Agreement" provided in Paragraph 18 is a true and correct copy of a portion the parties' contract. BHB denies that the portion in Paragraph 18, or any other portion of the contract now creates, or ever created, a valid and enforceable "agreement to arbitrate." BHB denies the remaining allegations in Paragraph 18. BHB affirmatively alleges that JAMS found that the portion of Paragraph 18 provided did not provide a contractual basis for JAMS to administer an arbitration between the parties.

19. BHB denies the allegations in Paragraph 19.

20. Regarding the allegations in Paragraph 20, BHB admits that CFS tried to file a Demand for Arbitration with JAMS on May 31, 2022. BHB asserts and affirmatively alleges that this demand was ineffective, as on July 11, 2022, JAMS concluded that it could not "proceed with this matter" in "light of the parties' contract and BHB's "objection to JAMS administration…" BHB denies the remaining allegations in Paragraph 20.

## FACTS

21. BHB admits the allegations in paragraph 21.

22. BHB admits that CFS purports to analyze digital media. BHB denies the remaining allegations in Paragraph 22.

23. BHB admits the allegations in paragraph 23.

24.  Regarding the allegations in Paragraph 24, BHB admits that a CFS employee picked up devices onsite from a client, and that CFS was purportedly unable to extract data from many of these devices. BMH lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24, and therefore denies them.

25.  Regarding the allegations in Paragraph 25, BHB admits that it told CFS that some devices were damaged in a fire, and that CFS was ultimately able to recover data from at least one of these devices. BHB denies the remaining allegations in Paragraph 25.

26.  BHB admits the allegations in Paragraph 26.

27.  Regarding the allegations in Paragraph 27, BHB denies the allegations.

28.  Regarding the allegations in Paragraph 28, BHB admits that CFS provided a cost estimate on or around June 14, 2021, that totaled $21,450 to $35,750, and that Relativity is a popular document-review platform. BHB denies the remaining allegations in Paragraph 28.

29.  Regarding the allegations in Paragraph 29, BHB admits that CFS's purported Director of Finance Joseph Lanterman emailed Hunter Thomson on September 23, 2021. BHB admits that Paragraph 29 accurately quotes a portion of that email. BHB denies the remaining allegations in Paragraph 29.

30.  Regarding the allegations in Paragraph 30, BHB admits that on November 17, 2021, BHB partner Ron Fisher sent Mark Lanterman an email reiterating that CFS had actual knowledge that the data are evidence relevant to pending proceedings in a federal court. BHB asserts and affirmatively alleges that Mr. Fisher stated in this email that CFS

would incur considerable risk if CFS destroy or spoliated the data, but that BHB could make necessary arrangements to receive the data if CFS would return it. BHB denies the remaining allegations in Paragraph 30.

31. Regarding the allegations in Paragraph 31, BHB admits that CFS seeks impose hosting charges on BHB for 3,141 GB of data at a rate of $361.20 per day, beginning on October 1, 2021. BHB denies the legal effect of hosting charges as alleged in Paragraph 31. BHB denies the remaining allegations in Paragraph 31.

32. Regarding the allegations in Paragraph 32, BHB admits that the quotation accurately reflects a portion of the parties' contract. BHB denies the legal effect of any time spent by CFS here. BHB denies the remaining allegations in Paragraph 32.

33. Regarding the allegations in Paragraph 32, BHB admits that the parties' contract references a 1.8% interest rate for "unpaid invoices." BHB denies the legal effect of the 1.8% interest rate referenced in the contract. BHB denies the remaining allegations in Paragraph 33.

34. Regarding the allegations in Paragraph 34, BHB denies the legal effect of interest and data hosting. BHB denies the remaining allegations in Paragraph 34.

35. BHB admits the allegations in Paragraph 35.

36. Regarding the allegations in Paragraph 36, BHB admits that CFS emailed two invoices to Hunter Thomson on August 4, 2021. These invoices contained more text in the "Description" column than earlier CFS invoices to BHB. BHB denies the remaining allegations in Paragraph 3.

37.  Regarding the allegations in Paragraph 37, BHB admits that Joe Lanterman sent Hunter Thomson an email on August 30, 2021 "following up on payment for the CFS and 360 invoices." BHB denies the remaining allegations in Paragraph 37.

38.  Regarding the allegations in Paragraph 38, BHB admits that Hunter Thomson responded to the August 30, 2021, email on September 4, 2021, and that Paragraph 28's quotation is accurate. BHB denies the remaining allegations in Paragraph 38.

39.  Regarding the allegations in Paragraph 39, BHB admits that Mark Lanterman emailed Matthew Borden and Hunter Thomson on October 14, 2021. BHB denies the remaining allegations in Paragraph 39.

40.  Regarding the allegations in Paragraph 40, BHB admits that Mark Lanterman sent Matthew Borden and Hunter Thomson an email on October 8, 2021. BHB admits that the second sentence in the quotation is accurate. BHB denies the remaining allegations in Paragraph 40.

41.  Regarding the allegations in Paragraph 41, BHB admits that Ron Fisher sent Mark Lanterman an email on October 14, 2021, and that the quotation from the second sentence to the end is accurate. BHB denies the remaining allegations in Paragraph 41.

42.  BHB denies the allegations in Paragraph 42.

43.  BHB denies the allegations in Paragraph 43.

44.  Regarding the allegations in Paragraph 44, BHB admits that the quoted language appears in the parties' contract. BHB denies the remaining allegations in Paragraph 44.

45.  BHB denies the allegations in Paragraph 45.

46.  BHB denies the allegations in Paragraph 46.

47. BHB denies the allegations in Paragraph 47.

48. BHB denies the allegations in Paragraph 48.

49. BHB admits that Mark Lanterman contacted BHB by phone and email in the fall of 2021. BHB denies the remaining allegations in Paragraph 49.

50. BHB denies that BHB never responded to CFS's request for arbitration. BHB lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 50, and therefore denies them.

51. Regarding the allegations in Paragraph 51, BHB admits that Ron Fisher emailed Mark Lanterman and Nancy Vold on November 17, 2021, that the quotation in Paragraph 51 is contained this email, and that Exhibit B to the Complaint appears to contain a true and correct copy of the email. BHB denies the remaining allegations in Paragraph 51.

52. BHB admits that CFS's counsel sent BHB a letter on December 2, 2021. BHB denies the remaining allegations in Paragraph 52.

53. BHB admits that Ron Fisher responded to the December 2, 2021, letter via email on December 10, 2021, and the quotation contained in Paragraph 53 is contained in the December 10 email. BHB denies the remaining allegations in Paragraph 53.

54. BHB admits that CFS filed a Demand for Arbitration with JAMS and notified BHB of the Demand for Arbitration via email. BHB denies the remaining allegations in Paragraph 54.

55. BHB admits that Ron Fisher sent JAMS and CFS's counsel an email on June 27, 2022, and that Exhibit C to the Complaint appears to contain a true and correct copy of the email. BHB denies the remaining allegations in Paragraph 55.

56. BHB admits the allegations in Paragraph 56.

57. Regarding the allegations in Paragraph 57, BHB admits that on July 11, 2022, JAMS concluded that it could not "proceed with this matter" in "light of the parties' contract and BHB's "objection to JAMS administration…" BHB also admits that a true and correct copy of correspondence from JAMS stating this is attached as Exhibit D to the Complaint. BHB denies the remaining allegations in Paragraph 57.

58. Regarding the allegations in Paragraph 58, BHB admits that counsel for CFS and counsel for BHB corresponded in July and August 2022, and that this included a phone call on July 20, 2022, and emails on July 26, July 28, August 1, and August 12. BHB further admits that attached to the Complaint as Exhibits E and F are true and correct copies of some of these emails. BHB denies the remaining allegations in Paragraph 58.

59. BHB denies the allegations in Paragraph 59.

60. BHB denies the allegations in Paragraph 60.

## FIRST CLAIM FOR RELIEF
### Breach of Contract

61. BHB asserts that Paragraph 61 contains no factual allegations for which an answer is required. To the extent an answer is required, BHB denies the same unless specifically admitted above.

62. Paragraph 62 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 62.

63. Paragraph 63 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 63.

64. Paragraph 64 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 64.

65. Paragraph 65 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 65.

66. Paragraph 66 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 66.

67. Paragraph 67 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 67.

68. Paragraph 68 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 68.

## SECOND CLAIM FOR RELIEF
### Account Stated

69. BHB asserts that Paragraph 69 contains no factual allegations for which an answer is required. To the extent an answer is required, BHB denies the same unless specifically admitted above.

70. Paragraph 70 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 70.

71. Paragraph 71 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 71.

72. Paragraph 72 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 72.

73. Paragraph 73 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 73.

## THIRD CLAIM FOR RELIEF
**Unjust Enrichment**

74. BHB asserts that Paragraph 74 contains no factual allegations for which an answer is required. To the extent an answer is required, BHB denies the same unless specifically admitted above.

75. Paragraph 75 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 75.

76. Paragraph 76 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 76.

77. Paragraph 77 sets forth a legal conclusion to which no response is required. If a response is required, BHB denies the allegations in Paragraph 77.

## PRAYER FOR RELIEF

BHB opposes each of CFS's requests for relief set forth in 1 and 2 under "**WHEREFORE,**" and 1 through 5 under "**IN THE ALTERNATIVE**".

## AFFIRMATIVE DEFENSES

1. CFS's Complaint fails to state a claim against BHB on which relief may be granted.

2. CFS's claims are barred in whole or in part by its failure to mitigate, minimize or avoid its damages, if any, the entitlement to which is denied.

3. CFS's Complaint is barred in whole or in part by the doctrines of waiver, estoppel, acquiescence, unclean hands, and/or other equitable doctrines.

4. CFS's Complaint should be dismissed because it is moot.

5. CFS's Complaint should be dismissed based on a lack of subject-matter jurisdiction.

6. CFS's Complaint should be dismissed based on improper venue.

7. CFS's Complaint should be dismissed based on forum non conveniens.

8. CFS's Complaint may be barred, in whole or in part, because CFS lacks standing, authority, and/or legal capacity necessary to assert such claims.

9. CFS has suffered no damages in connection with the above-captioned action.

10. CFS has not and will not suffer any irreparable injury.

11. CFS's Complaint may be barred by any affirmative defenses contemplated by the Federal Rules of Civil Procedure. BHB cannot determine the applicability of such defenses until it can complete discovery, and therefore, BHB incorporates these affirmative defenses. BHB reserves the right to assert affirmative defenses that arise from discovery that arises.

## DEMAND FOR JURY TRIAL

BHB demands a jury trial as to all issues.

## PRAYER FOR RELIEF

BHB requests an award against CFS as follows:

- Declaring that no enforceable arbitration agreement has been formed between CFS and BHB;

- Declaring that CFS's actions, as set forth above, constitute multiple, separate violations of Minnesota Statutes sections 325F.69, subdivision 1, and Minnesota Statutes sections 325D.44, subdivision 1;

- Enjoining CFS and its employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from engaging in deceptive practices and making false or misleading statements in violation of Minnesota Statutes sections 325F.69, subdivision 1, Minnesota Statutes sections 325D.44, subdivision 1;

- Other declaratory and injunctive relief;

- An award in favor of BHB and against CFS in an amount to be proven at trial;

- Reasonable attorneys' fees and costs under the parties' contract;

- Costs and attorneys' fees, as authorized by Minnesota Statutes section 8.31, subdivision 3(a) or other applicable laws;

- Awarding prejudgment interest; and

- Further and appropriate relief as the Court deems just and reasonable.

HELLMUTH & JOHNSON

Dated: October 24, 2022

By: */s/ Brendan M. Kenny*
Brendan M. Kenny, #03911791 (MN)
8050 W. 78th St.
Edina, MN 55439
Phone: 952-941-4005
Fax: 952-941-2337
Email: bkenny@hjlawfirm.com

***ATTORNEYS FOR DEFENDANT BHB***