## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Computer Forensic Services, Inc., and 360 Security Services, LLC, | Case No. 22-cv-02665(DWF/ECW) |
| Plaintiffs, | Date Complaint filed: Aug. 16, 2022 |
| vs. | **DEFENDANT BRAUNHAGEY & BORDEN LLP'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| BraunHagey & Borden LLC, | |
| Defendant, | |

## INTRODUCTION

Defendant BraunHagey & Borden LLP (BHB)[1] seeks relief from this Court in this motion because Computer Forensic Services, Inc. and 360 Security Services, LLC (CFS) are holding the data and devices of BHB's clients—lead class plaintiffs in a consumer class-action lawsuit—hostage. CFS and its founder and Mark Lanterman have turned a dispute with BHB over forensic-services invoices into a threat against BHB and the class plaintiffs. Unless BHB pays everything Lanterman believes is due, he denies access to, and threatens to destroy, the class plaintiffs' devices—as he stated at the beginning of this dispute:[2]

> In any event, our contacts are completely appropriate. First, the communications with the Fishes were about the very subject matter they keep *calling us* about—the documents. Second, BraunHagey & Borden is in breach of the contract for non-payment. We have made attempts to keep moving forward, but again you have chosen to ghost us. CFS and 360 are now longer bound by any confidentiality obligation. We consider all property in our possession abandoned and will dispose of it as appropriate.

---

[1] BHB was incorrectly sued as "BraunHagey & Borden *LLC*" (emphasis added).
[2] Decl. Fisher Supp. Mot. Prelim. Inj. (Decl. Fisher) ¶ 13, Ex. E (Lanterman email, dated Nov. 9, 2021).

As Lanterman states in the above letter, CFS:

- Directly contacted the lead class plaintiffs seeking payment, heightening their fear that CFS will destroy their data and devices;[3]

- Declared that CFS will not honor its obligation to protect the confidentiality of the class plaintiffs' data and devices;[4]

- Declared that CFS considers the class plaintiffs' data and devices as "abandoned;"[5] and

- Declared that it will dispose of the data and devices as CFS and Lanterman see fit.[6]

BHB has repeatedly demanded that CFS return the data and devices, including four times in writing by BHB's counsel in July and August 2022. CFS and Lanterman will not budge, or even respond substantively. The invoices in dispute when Lanterman wrote this letter totaled $33,119.80.[7] As of October 28, 2022, CFS is seeking $143,757.60 in data-hosting fees alone, more than 90% of which accrued after CFS stated the data and devices were abandoned—despite BHB's repeated demands that CFS return.

CFS has shown a pattern and practice of fraudulent statements, misrepresentations, and deceptive practices to rack up high fees for many years. With BHB and the class plaintiffs, the scheme had three parts. First, CFS provides large and inadequately supported invoices. Second, CFS live-hosts data on its servers at exorbitant rates. Third, CFS leverages extremely high—and continuingly accruing—monthly hosting fees *and* its physical custody of the data and devices to bully BHB and the class plaintiffs to capitulate

---

[3] Decl. Fisher ¶ 13, Ex. E. ("...our contacts were completely appropriate...the communications with the [class plaintiffs] were about the very subject matter that they keep *calling* us about...").
[4] *Id.* ("[We] are no longer bound by any confidentiality obligation.")
[5] *Id.* ("we consider all property in our possession abandoned…"_)
[6] *Id.* ("we will dispose of it as appropriate.")
[7] Compl. ¶ 8 ("With respect to the CFS invoices, [BHB] has not paid a dime of the $33,119.80 due.")

to CFS's unjust and unethical demands. BHB and the class plaintiffs cannot and will not do so.

Unfortunately, this is not the first that Lanterman and CFS has practiced data extortion, as Minnesota attorney Kimberly Hanlon's declaration regarding Lanterman's improper threats to *auction* her and other attorneys' client data in 2013 and 2014 demonstrates. CFS must be prevented from holding the data and devices hostage any longer. BHB and its clients will be irreparably harmed if CFS is allowed to continue. Lanterman and CFS are not only denying BHB and its class plaintiffs access to their own devices; they threaten their right and need to control their own evidence in the *Spectrum* litigation.

Thus, BHB's motion for a preliminary injunction should be granted because: CFS's improper withholding and threatened destruction of the devices, data, documents, and information of BHB's clients irreparably harms BHB and the class plaintiffs; the balance of harms supports BHB; BHB has shown far more than the requisite fair chance of prevailing; and the public's interest favor unencumbered access to the civil-justice system.

Based on all this, this Court should order CFS to: (1) return all devices of BHB's clients; (2) return all data, documents, and information of BHB's clients; and (3) preserve all data, documents, and information related to CFS's engagement with BHB, including all communications and billing records.

## STATEMENT OF FACTS

### I. CFS AND LANTERMAN'S PAST EXTORTIONATE THREATS TO ABUSE DATA IN THEIR POSSESSION

In September 2013, Kimberly Hanlon was co-founder and co-owner of MoreLaw Minneapolis, LLC, which offered office and meeting spaces and support services. After it was discovered that a paralegal MoreLaw hired had felony convictions involving fraud, CFS was contacted to determine whether the paralegal had improperly accessed or acquired data in connection with the legal work the paralegal did on two computers for three law firms. (Declaration of Kimberly Hanlon (Decl. Hanlon) ¶¶ 3–12.) When asked what the price of the forensic work would be, CFS stated that they would take a preliminary look at the computers, see if there were any red flags, and then provide Morelaw with a price quote and a proposed scope of work. (Decl. Hanlon ¶ 13.)

Instead, MoreLaw called CFS about the computers, learned that the imaging and preliminary work was $600 for the computers, paid the $600, and after the computers had been returned, discovered that CFS had invoiced them thousands of more dollars without providing any added work. (*Id.* ¶¶ 14–23, Ex. 1.) When MoreLaw stated that it had never agreed to the $600 dollars it already paid, much less the thousands extra that Lanterman demanded, Lanterman stated that CFS would "escalate" its collection efforts, including a "a claim and lien against the data *which will result in a public auction of your data*." (*Id.* ¶¶ 24–31, Exs. 3, 4, 5.) (Emphasis added.)

Lanterman backed off only after Ms. Hanlon contacted the Minnesota Attorney General's Office, the Hennepin County Attorney's Office, the Federal Trade Commission, and the media. (*Id.* ¶¶ 32–35.)

4

## II.    CFS AND LANTERMAN'S PAST FRAUDULENT BILLING ISSUES

Following a jury trial on a breach-of-contract claim brought by CFS arising from forensic work performed for a felon, Judge Philip Bush granted judgment as a matter of law on the breach-of-contract claim. *Lanterman v. Afremov*, No. 27-CV-12-22089, 2014 WL 3579827, at *5 (Minn. Dist. Ct. July 17, 2014). Thus began a long and contentious court battle, and CFS was eventually awarded some of the money it sought.[8] But Judge Bush's factual findings below remain undisturbed by any appellate decision,[9] and illustrate the first part of CFS's billing scheme that made this motion necessary:[10]

- CFS destroyed billing records, even though "Lanterman had billing disputes in the past" and "the prospect of a billing dispute with [the convicted felon] was plainly evident…"[11]

- According to CFS's invoice, *Lanterman and another CFS employee worked on the project 17.9 hours a day for 59 days straight with no break.*[12]

- According to CFS's invoice, *Lanterman and another CFS employee each worked more than 28 hours per day for 11 days.*[13]

- At the time, CFS had other clients and work, and Lanterman was "CEO of the company with other administrative duties and responsibilities" besides working on the project.[14]

---

[8] The case was remanded "for a new trial on damages only." Decl. Kenny Supp. Mot. Prelim. Inj. (Decl. Kenny) ¶ 3, Ex. 5, Order Adjudicating Attorney's Lien at 3, *Lanterman v. Afremov*, No. 27-CV-12-22089 at 3 (Minn. Dist. Ct. Jan. 3, 2022).

[9] While the jury awarded CFS a total $105,568.75 on a breach-of-contract theory, Judge Bush awarded $103,012.33 of the $674,861.08 CFS sought, based on an unjust-enrichment theory. *Lanterman*, 2014 WL 3579827, at *1, *3, *13. The Court of Appeals reversed, holding that "there was substantial evidence in the record supporting the jury's finding of a contract between the parties[,]" and that district court erred in its jury instruction defining costs. *Lanterman v. Afremov*, No. A15-0729, 2016 WL 1551602, at *6 (Minn. Ct. App. Apr. 18, 2016). The case was remanded "for a new trial on damages only." Decl. Kenny Supp. Mot. Prelim. Inj. (Decl. Kenny) ¶ 3, Ex. 5, Order Adjudicating Attorney's Lien at 3, *Lanterman v. Afremov*, No. 27-CV-12-22089 at 3 (Minn. Dist. Ct. Jan. 3, 2022).

[10] *See, e.g.,* Decl. Kenny ¶ 3, Ex. 5 at 1 ("In his Order, Judge Bush questioned the credibility of Lanterman's testimony and the propriety of CFS's billing practices.").

[11] *Lanterman*, 2014 WL 3579827, at *4.

[12] *Id.* at *5.

[13] *Id.* at *8.

[14] *Id.* at *6.

- *"The actual human time expended is a complete unknown since CFS destroyed all of the time records, [and] the invoices do not distinguish between computer time and human time..."*[15]

- Apart from the invoices, CFS did not "produce[] or present[] any written record of the amount of computer run time expended…"[16]

- CFS offered no testimony "that it is reasonable in the industry to charge separately for computer run time in addition to the worker's human time…"[17]

- When CFS's former attorney was called as a witness for Lanterman, he "credibly testified that Lanterman's reputation for integrity is highly questionable and Lanterman's reputation among law firms raise serious questions about his billing practices."[18]

- Lanterman testified in a federal proceeding regarding the disputed invoices that he had 11 people working on the project, but it was later established that only three people were working on the project.[19]

- "[B]illing for computer run time is a fiction that Lanterman used to avoid the problems created by his false testimony in federal court that he had 11 people working full time 24 hours a day in shifts on the […] project for a total of 1,500 human work hours."[20]

- "To explain away the fact that there were not enough people working on the project to come anywhere close to account for an $800,000 bill, Lanterman later unbelievably testified that the hours were both human and computer run time."[21]

## III.    CFS AND LANTERMAN'S PAST FRAUDULENT DATA-HOSTING BILLING ISSUES

To complement these findings, the *East Coast Test Prep*[22] case illustrates the second part of CFS's pattern and practice: the manipulation of devices and data to secure exorbitant rates. In *East Coast Test Prep*, CFS made forensic images of devices it had

---

[15] *Lanterman*, 2014 WL 3579827, at *6.
[16] *Id.* at *4.
[17] *Id.* at *5.
[18] *Id.* at *10.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *E. Coast Test Prep, LLC v. Allnurses.com, Inc.*, No. CV 15-3705 (JRT/ECW), 2018 WL 7050303 (D. Minn. Dec. 11, 2018), *report and recommendation adopted*, No. CV 15-3705 (JRT/ECW), 2019 WL 1487812 (D. Minn. Apr. 4, 2019).

obtained to allow for searching and production, but the "devices had already been physically preserved up until that point." *E. Coast Test Prep*, 2018 WL 7050303, at *2. When the court asked the counsel retaining CFS why he "believed the most effective way to preserve the device [was] by making a forensic image and storing them on their expert's server," the counsel responded that Lanterman told him that the devices were in danger of spoliation, and "'the only way to prevent that loss, losing that data, is to create an image.'" *Id.* at *4. The court ultimately found that "[s]ince the devices were already physically preserved," counsel should have "consult[ed] with their expert to provide estimates related to the costs associated with imaging and sorting" the devices. *E. Coast Test Prep*, 2018 WL 7050303, at *6.

The parties submitted a stipulated order (which the court approved) that provided, in part:

> (1) the original Devices shall be securely stored in a temperature controlled room…and (2) forensic digital images of the original Devices...shall be stored on suitable portable external hard drives or flash based memory storage devices...securely stored in a temperature controlled room…

*Id.*

This agreement reduced the ongoing storage rate from $25,755 a month to $464 a month. *Id.* at *3 & *5.

## IV.    BHB RETAINS CFS.

BHB is a law firm appointed to represent a proposed consumer class in the pending lawsuit *Spectrum Scientifics v. Celestron*, Case No. 5:20-cv-03642-EJD (N.D. Cal.) (the *Spectrum* litigation). (Decl. R. Fisher Supp. Mot. Prelim. Inj. (Decl. Fisher) ¶ 2.) As appointed counsel to the class plaintiffs, BHB has a fiduciary duty to limit the class's costs and maximize its recovery. (*Id.*) The representative plaintiff in that case is Radio

City, Inc., a Minnesota corporation. (Decl. Fisher ¶ 2.) Radio City had a retail store in Minneapolis that sold telescopes until it closed December 2018. (*Id.*) In the *Spectrum* litigation, Radio City alleges that illegal prices set by the defendants—a group of telescope manufacturers, holding companies, and shell corporations controlled by a Chinese national—unlawfully depressed margins on the telescopes it sold. (*Id.*)

BHB retained CFS on June 1, 2021, to obtain information from electronic and physical (paper) sources related to Radio City. (*Id.* ¶ 3.) The parties entered into a written agreement. (*Id.* ¶ 3, Ex. A.)

The contract provides that "[d]ata hosting may be terminated at any time after the start of data hosting invoicing." (Decl. Fisher ¶ 3, Ex. A at 2 (emphasis added).) Upon termination, "unpaid data hosting charges are due…" (*Id.*) And the contract purports to "reserve the right to declare as abandoned any and all data and devices a customer has placed in [CFS's] custody for a period greater than 60 days." (*Id.* ¶ 3, Ex. A at 3.) CFS were only able to successfully extract data from some of the class plaintiffs' electronic devices. (*Id.* ¶ 4.)

## V.    FEE DISPUTE AND ANTICIPATED LITIGATION.

On July 7, 2021, BHB received invoices from CFS for $24,754.80 and $8,072.50. (*Id.* ¶ 5.) On July 22, 2021, BHB questioned the invoices based on their lack of detail and 51 hours of time for analysis of a handful of drives. (*Id.*, Ex. B.)

BHB then discovered that CFS was attempting to bill BHB for the many hours that its computers were processing data as "forensic analyst time." (*Id.* ¶ 6.) Additionally, a second vendor successfully recovered the data that CFS failed to extract, while billing only some of the time and money that CFS did. (*Id.*)

On September 23, 2021, CFS emailed BHB the invoices to date, which were for $292.50, $8,072.50, and $24,754.80. (Decl. Fisher ¶ 9.) Beginning on October 1, 2021, without BHB's knowledge or consent, CFS began live-hosting the data rather than preserving it. (*Id.* ¶ 7.) In early November 2021, CFS contacted BHB's clients in the *Spectrum* litigation and demanded that they personally pay the invoices and insinuated that the clients' property might be destroyed if payment was not made. (*Id.*)

On November 8, 2022, Ron Fisher emailed a letter to CFS. (*Id.* ¶ 8, Ex. D.) He protested CFS's direct contact with the class plaintiffs. (*Id.*) CFS demanded that they personally pay invoices and insinuated that their property might be destroyed if CFS was not paid. (*Id.*) Mr. Fisher pointed out that this contact was inappropriate for many reasons, including that CFS's business relationship was with BHB, not the class plaintiffs. (*Id.*) He also explained that CFS's attempted billing of computer-processing time as analyst time was not industry-standard and not authorized by the parties' agreement. (Decl. Fisher ¶ 8, Ex. D.) Finally, he stated that BHB would be happy to discuss what would be a reasonable payment to CFS for services rendered, but that BHB would need detailed invoices that excluded computer-processing time. (*Id.* ¶ 8, Ex. D.)

On November 9, 2021, Lanterman emailed a letter to Mr. Fisher. (*Id.* ¶ 9, Ex. F.) In the letter, Lanterman:[23]

- boasted that CFS was in direct communication with BHB's clients regarding the data;

- asserted that CFS was "now [sic] longer bound by any confidentiality obligation";

- stated that CFS "consider[s] all property in our possession abandoned and will dispose of it as appropriate."; and

---

[23] Decl. Fisher ¶ 9, Ex. E.

- promised to "notify interested parties of this development."

On November 17, 2021, Mr. Fisher was contacted by arbitrator informing him that Lanterman had contacted them. (Decl. Fisher ¶ 11.) Mr. Fisher explained that no such arbitration agreement had been reached. (*Id.*)

The same day, Mr. Fisher sent an email responding to Lanterman's November 9 letter. (*Id.* ¶ 10, Ex. F.) Mr. Fisher reiterated that CFS had actual knowledge that the data was evidence relevant to pending proceedings in a federal court, that CFS would incur legal risk if CFS destroyed or spoliated the data, but that BHB could make necessary arrangements to receive the data if CFS would return it. (*Id.* ¶ 10, Ex. F.)

CFS refused to relent, and on May 31, 2022, again attempted to bring an arbitration, this time before JAMS, and this time with an arbitration demand (*Id.* ¶ 12, Ex. G.) After Mr. Fisher again objected, JAMS concluded that it could not "proceed with this matter" in "light of the parties' contract" and BHB's "objection to JAMS administration…" (*Id.* ¶ 12, Ex. H.)

In July and August 2022, the parties' counsel discussed various matters related to the dispute, including potential arbitrators, and the return of the data and devices. (Decl. Kenny ¶ 2, Exs. 1–4.) BHB's counsel asked four separate times in writing for the data and devices of BHB's clients to be returned, but CFS refused to do so. (*Id.* ¶ 2, Exs. 1–4.)

Despite BHB's demands that CFS return the devices, CFS has stated that it intends to invoice BHB for data-hosting charges totaling $84,882.82, covering October 1, 2021, to May 24, 2022 alone—and it will continue to bill for this live-hosting indefinitely.

(Decl. Fisher ¶ 17.) In its arbitration demand, it sought $136,635.94 excluding attorneys' fees. (*Id.* Ex. G at ¶ 10.)

On August 16, 2022, CFS filed this suit in Hennepin County District Court. CFS alleges that the fees BHB allegedly owes for live-hosting data alone are more than $100,000. (Complaint ¶¶ 29–34 (alleging daily hosting rate of $361.20 since October 1, 2021, $143,757.60 as of November 3, 2022,[24] and "charges for hosting continue to accrue.")).

On October 24, 2022, BHB removed this case to this Court. BHB attempted to resolve this dispute with CFS's counsel without a motion for a preliminary injunction, but these attempts proved fruitless. (Meet-and-Confer Statement.)

## ARGUMENT

### I.    THE STANDARD FOR INJUNCTIVE RELIEF.

In determining whether a party is entitled to a preliminary injunction, the court considers the: (1) threat of irreparable harm; (2) the balance of harms; (3) the probability that the moving party will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

### A.  Irreparable Harm

CFS refuses to return the class plaintiffs' data or devices to BHB during the *Sprectrum* litigation, when the data and devices themselves are relevant to this litigation. The present denial of access to—and the threat of destruction of—evidence here threatens the progress of the *Spectrum* litigation. BHB and the class plaintiffs' dilemma is stark: capitulate to CFS, or impair their ability to control their evidence in a class action in

---

[24] There are 398 days between when BHB began allegedly owing these hosting fees on October 1, 2021 and November 3, 2022: $361.20 x 398 = $143,757.60.

which hundreds of millions of dollars are at stake. There could hardly be a clearer case of irreparable harm.

The irreparable harm factor focuses on the harm or potential harm to the plaintiff from defendant's conduct or threatened conduct. *Dataphase*, 640 F.2d at 114. On the other hand, courts have long recognized that injunctive relief is inappropriate when money damages would suffice, since "[a] dollar loss invokes the Court's legal powers, as opposed to its equitable powers." *Halikas v. Univ. of Minn.*, 856 F. Supp. 1331, 1334 (D. Minn. 1994) (citing *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75–76 (1992)). Injunctive relief is appropriate here because irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *See Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

### B. Loss of Access to Evidence and Full Control of Evidence Itself Is an Irreparable Harm to Both BHB and the Class Plaintiffs.

Harm impacting litigation may be irreparable harm. *Daewoo Elecs. Corp. of Am. v. W. Auto Supply Co.*, 975 F.2d 474, 478 (8th Cir. 1992) ("Accordingly, the district court below found that Western Auto would suffer irreparable harm if injunctive relief were not issued because it would face relitigation of claims already adjudicated in its favor."). Legal remedies are inadequate where a prevailing party "is threatened with burdensome and repetitious relitigation of the same issues…" *PNY Techs., Inc. v. Miller, Kaplan, Arase & Co., LLP*, No. 15-CV-01728-MMC, 2017 WL 2876736, at *5 (N.D. Cal. July 6, 2017) (cleaned up) (citing *Daewoo*, 975 F.2d at 478–79). And irreparable harm may exist when out-of-court activity would "defeat and delay satisfaction of those claims" in a civil action. *Lynch Corp. v. Omaha Nat. Bank*, 666 F.2d 1208, 1212 (8th Cir. 1981) (holding

that there was "no adequate remedy at law because a multiplicity of suits would be required to gain relief.")

District courts also routinely grant injunctions to preserve evidence to "keep[] alive an otherwise viable" claim. *Id.* at 1309. In determining whether to issue a preservation injunction, courts consider: (1) the danger to the "existence and maintenance of the integrity of the evidence;" (2) irreparable harm likely to result without an order; and (3) the burden of preserving the evidence. *City of Wyoming v. Procter & Gamble Co.*, No. 15-CV-2101 (JRT/TNL), 2016 WL 6908110, at *2 (D. Minn. Oct. 7, 2016) (citation and quotation omitted); *see United States ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1082 (8th Cir. 2014) (district courts have discretion "to order the preservation of evidence").

Here, BHB and the class plaintiffs are at risk of irreparable harm because denying them access to—and threatening to destroy—the devices remove BHB and the class plaintiffs' right to full control of their own evidence, which materially effects their prosecution of the *Spectrum* litigation.

### C. Attorneys, and Class Counsel in Particular, Have Fiduciary Duties to Safeguard their Clients' Interest.

An attorney-client relationship gives rise to fiduciary duties. At its core, "[t]he attorney is under a duty to represent the client with undivided loyalty and to preserve the client's confidences." *STAR Centers, Inc. v. Faegre & Benson, LLP*, 644 N.W.2d 72, 77 (Minn. 2002).

"The common law duty to preserve evidence clearly extends to ESI."[25] "The duty to comply with a preservation obligation is an affirmative duty."[26] An attorney's duty to preserve evidence is part of an attorney's overarching duty of competence. *See* Minn. R. Prof. Conduct 1.1 ("A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.") An attorney cannot simply ignore technology, leaving this solely to hired experts. *See* Minn. R. Prof. Conduct 1.1, Comment, *Maintaining Competence* [8] ("To maintain the requisite knowledge and skill, a lawyer should keep abreast of changes in the law and its practice, including the benefits and risks associated with relevant technology….").[27] But a party need only take "reasonable steps to preserve" ESI. *E. Coast Test Prep*, 2018 WL 7050303, at *7 (quoting Fed. R. Civ. P. 37(e)). And a party "may act reasonably by choosing a less costly form of information preservation, if it is substantially as effective as more costly forms." *See* Fed. R. Civ. P. 37, Committee Note (2015). This duty also includes "supervis[ing]…*vendors*."[28] Attorneys themselves must consider how to protect their client's data.[29]

If a court determines that an attorney violates this rule "without substantial justification," the court must impose sanctions. Fed. R. Civ. P. 26(g)(3). Federal Rule of

---

[25] The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. 1, 93 (2018).

[26] *Id.* at 102.

[27] *E.g.*, Minnesota Lawyers Professional Responsibility Board Opinion No. 22 (Mar. 26, 2010) ("Removing metadata from evidentiary documents in the context of litigation or in certain other circumstances may be impermissible or illegal.").

[28] Recommendations & Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. at 161 (emphasis added) (citing Model Rules 5.1 and 5).

[29] *See* The Sedona Conference, Guidance for the Selection of Electronic Discovery Providers, 18 Sedona Conf. J. 55, 99 (2017) (Attorneys must determine: "What happens when the project is over (and what determines the end date)? What happens to electronic and hardcopy data, work-product, backups, etc.?").

Civil Procedure 37(e) states that with lost or destroyed evidence, the court may "presume that the lost information was unfavorable to the party, "instruct the jury that it may or must presume the information was unfavorable to the party," dismiss the action, or enter a default judgment. Rule 37(e)(2) includes no requirement for showing prejudice, as prejudice is presumed. *See* Fed. R. Civ. P. 37, Committee Note (2015).

Although Subdivision (e)(2) requires a finding that the party acted with the intent to deprive another party of the information's use in the litigation, this finding may be made by the court when "ruling on a pretrial motion, when presiding at a bench trial, or when deciding whether to give an adverse inference instruction at trial." Or a court may "conclude that the intent finding should be made by a jury…" Fed. R. Civ. P. 37, Committee Notes on Rules (2015).

Here, CFS's denial of BHB and the class plaintiffs' right to full control of their evidence, on top of the threat to destroy the devices, undermines both BHB and the class plaintiffs' ability to prosecute the *Spectrum* litigation. It also potentially subjects BHB and the class plaintiffs to expensive and time-consuming discovery disputes by making it harder for BHB and the class plaintiffs to rebut serious, though baseless, discovery challenges. Because CFS should not be permitted to hold the data, devices, and the *Spectrum* litigation hostage, CFS should be ordered to return the data and devices.

**D. CFS's Extortion Materially Affects BHB and the Class Plaintiffs' Right and Need to Full Control of Their Evidence.**

Certified representatives and class counsel assume certain fiduciary responsibilities to the class. *Sondel v. Northwest Airlines, Inc.*, 56 F.3d 934, 938 (8th Cir. 1995). The lead plaintiff assumes a position of fiduciary character "such that he is not only entitled to represent the interests of the class, but has a duty to do so…" *In re*

*BankAmerica Corp. Securities Litigation*, 775 F.3d 1060, 1063 n.1 (8th Cir. 2015). "A proposed class representative is not adequate or typical if it is subject to a unique defense that threatens to play a major role in the litigation." *In re Milk Prods. Antitrust Litig.,* 195 F.3d 430, 437 (8th Cir. 1999); *see Rupp v. Thompson*, No. C5-03-347, 2004 WL 3563775, at *5 (Minn. Dist. Ct. Mar. 17, 2004) (citation omitted). The standard for adequacy includes the adequacy of the attorneys seeking appointment as class counsel.[30]

Here, BHB represents Radio City, one of two lead class plaintiffs in the class-action litigation. The denial of their right to full control of their evidence could subject them to serious, through baseless, discovery challenges under Rule 26(g) and Rule 37(e) throughout the discovery process—including the threat of an adverse-inference instruction to jury at trial. Because CFS's violation of BHB and the class plaintiffs' right and need to control their evidence materially affects their ability to prosecute the *Spectrum* litigation, CFS should be ordered to return the data and devices.

### E. Balance of Harms

Courts must consider "the balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties." *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994).

Here, this factor overwhelming favors BHB and its class plaintiffs because the harm of not granting the injunction would be permanent and unwarranted, but any harm to CFS is purely monetary, and is recoverable as damages. CFS has had many opportunities to provide a valid basis for not returning the data and devices, but CFS has

---

[30] *See In re Retek Inc. Securities Litigation*, 236 F.R.D. 431, 435 (D. Minn. 2006) (The adequacy requirement of Rule 23(a)(4) includes "whether the class representatives will vigorously prosecute the interests of the class through qualified counsel.").

never done so. Indeed, CFS merely wishes to continue to accrue purported (and exorbitant) live-hosting fees as a litigation strategy.

CFS never identifies a non-monetary reason, because none exists. CFS wants to have it both ways. To be sure, they want the data and devices treated as abandoned, effective November 9, 2021 (the date of Lanterman's letter to Mr. Fisher). But if this were the case, CFS would have no reason to continue live-hosting the data, and would be limited to the $14,087.19 in live-hosting fees generated between October 1 and November 9, 2021.[31] So the irony here is that CFS considers the devices abandoned, but at the same time will continue live-hosting the data and denying access to the devices indefinitely—giving it the option to destroy (or threaten to destroy) the devices through the life of the *Spectrum* litigation.

The agreement that CFS and the parties reached in the *East Coast Test Prep* case is a premier example of what could easily be accomplished here. In *East Coast Test Prep*, the parties stipulated to preserving the data and devices, which decreased the monthly hosting fees $25,755 a month to $464 a month. *See E. Coast Test Prep*, 2018 WL 7050303, at *3, *5. But CFS has been unwilling to discuss any such agreement, to the detriment of BHB and the class plaintiffs. Because the only damage to CFS is that CFS will be unable to charge BHB and the class plaintiffs ever-increasing and accruing hosting fees by refusing to return—or even move to cold storage—the class plaintiffs' data and devices, the balance of harms overwhelmingly favors BHB and the class plaintiffs.

---

[31] There are 39 days between October 1 and November 9, 2021: 39 x 361.21 = $14,087.19. "Data hosting may be terminated at any time after the start of data hosting invoicing", and upon termination, "*unpaid data hosting charges are due…*" (Decl. Fisher ¶ 5, Ex. A at 2) (emphasis added).)

### F.  BHB and the Class Have a Strong Likelihood of Success on the Merits.

To grant a motion for a preliminary injunction, a court need only determine that the plaintiff has "fair chance of prevailing." *Planned Parenthood Minn., N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). A "fair chance is less than a preponderance of the evidence, but more than an outside chance of success." *Peakspeed, Inc. v. Emerson*, No. CV 20-1630 (JRT/BRT), 2020 WL 8256369, at *7 (D. Minn. Dec. 29, 2020) (citing *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003)). And the district court need only find this for a "*single cause of action…*" *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (emphasis added) (citing *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002)).

BHB has 10 counterclaims here. For all the reasons addressed below, BHB and the class have a strong likelihood of success on these claims.[32]

### 1.  Conversion and Replevin (Ninth and Tenth Claims)

Conversion is "an act of willful interference with [the personal property of another] without lawful justification. *Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 585 (Minn. 2003) (quotations omitted). The "depriv[al] of its use or possession" must be permanent or for an indefinite period. *See Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948). Replevin is also a way to test the superiority of property rights, but with the ability to recover the property itself instead of damages. *Widgren v. Massie*, 352 N.W.2d 420, 424–25 (Minn. Ct. App. 1984).

---

[32] In this motion, BHB does not address its chances of prevailing regarding CFS's computer-processing and live-data hosting practices—even though BHB has much more than a fair chance of prevailing on these claims—because the damages to BHB and the class plaintiffs arising from these practices can theoretically be remedied by money damages.

Here, CFS refuses to return the data and devices unless CFS is paid what it demands. CFS that it can treat the devices as abandoned property and simply destroy them, if it so chooses. BHB has much more than a fair chance of prevailing on its conversion and replevin claims based on CFS and Lanterman's actions, statements, and assertions about the class plaintiffs' data and devices.

### 2. Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing

An action for breach of contract based on breach of a contractual representation of future legal compliance is actionable without proof of reliance. *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014). And when parties perform on a contract, the covenant of good faith and fair dealing bars a party from unjustifiably hindering the other party's performance. *Minnwest Bank Cent. v. Flagship Properties LLC*, 689 N.W.2d 295, 303 (Minn. Ct. App. 2004).

Here, CFS breached any enforceable contract—at the very latest—when Lanterman stated in his November 9, 2021 letter that CFS: (1) would continue to contact the class plaintiffs seeking payment, even though the class plaintiffs were very worried about the danger their devices would be destroyed; (2) was no longer bound by "any confidentiality obligation"; (3) will treat the class plaintiffs' data and devices as "abandoned property"; and (4) promised to "notify interested parties of this development." (Decl. Fisher ¶ 13, Ex. E.) The promise underlying any agreement between the parties, was that the class plaintiffs' data and devices would be protected, and that the right and need of both BHB and the class plaintiffs to fully control their evidence would not be threatened by CFS's treatment of the data and devices. CFS's actions also violated

19

the covenant of good faith and fair dealing because they prevented BHB from arranging for the return of the data and documents as provided in the contract.

### 3. Fraud

The required elements of a fraud action are: (1) a false representation of "a past or existing material fact susceptible of knowledge"; (2) made knowingly, or with recklessness as to its truth or falsity; (3) with the intention to induce another to act in reliance; and (4) the other party was damaged because it relied on the false representation. *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986). Nondisclosure may constitute fraud, but there must be a suppression of facts that one party is under a legal or equitable obligation to communicate to the other, and that the other party has a right to have communicated to him. *See Richfield Bank & Tr. Co. v. Sjogren*, 309 Minn. 362, 366, 244 N.W.2d 648, 650 (1976). A false representation is material if the fact untruly asserted or wrongfully suppressed had been known to the defrauded party, that knowledge would have influenced his judgment or decision. *See Lowe v. United States*, 389 F.2d 108, 111 (8th Cir. 1968), *cert. denied*, 392 U.S. 912 (1968).

Here, CFS promised to: (1) "maintain the confidentiality of all project information" entrusted to its custody;[33] (2) "exercise necessary care to secure and protect from physical damage or destruction, the data, materials, equipment and information provided by BHB."[34]; and (3) allow data hosting be terminated "at any time after the start of data hosting invoicing," subject to "unpaid data hosting charges…"[35] But in fact, CFS intended to be unbound from the duty of confidentiality, and deny access to data and

---

[33] Ex. A at 1.
[34] Ex. A at 3.
[35] *Id.* ¶ 5, Ex. A at 2.

devices, and threaten to destroy the class plaintiffs' devices, to force BHB and the class plaintiffs to pay CFS whatever it demanded, without heed to the agreement's terms.

### 4. Fraud, Misrepresentation, and Deceptive Practices

The Minnesota Consumer Fraud Act ("CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby" under Minnesota Statutes, section 325F.69. And the Minnesota Deceptive Trade Practices Act ("UDTPA") prohibits deceptive trade practices in the course of a business, vocation, or occupation. Minn. Stat. § 325D.44, subd. 1.

The CFA and UDTPA "are remedial in nature and are to be liberally construed in favor of protecting consumers." *State v. Minnesota Sch. of Bus., Inc.*, 935 N.W.2d 124, 133 (Minn. 2019) (quotation and citation omitted). The CFA "reflects a clear legislative policy encouraging aggressive prosecution of statutory violations and thus should be generally very broadly construed to enhance consumer protection." *Id.* (cleaned up). Under both the CFA and UDPTA, proof of reliance is not required. *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 786 (D. Minn. 2020)

Here, CFS's pattern and practice of billing problems as shown in *Afremov* and *East Coast Test Prep*, combined with denying customers access to, and threatening to destroy, customers' data and devices to obtain the money CFS demands, is the exact practices that suits under the CFA and UDTPA are meant to address. Kimberly Hanlon's declaration shows that CFS has done this before. In short, BHB has more than a fair chance of prevailing on its CFA and UDTOA claims by knowingly and intentionally

misrepresenting, omitting, concealing, or failing to disclose material facts about billing practices and violation of civil-litigation parties and attorneys' access to the parties' data and devices

### 5. Breach of Fiduciary Duty

An action for breach of fiduciary duty requires a plaintiff to establish: (1) the existence of a relationship fiduciary, requiring one party to apply the highest standard of integrity to furthering the other party's interests; and (2) breach of that duty. *Carlson v. SALA Architects, Inc.*, 732 N.W.2d 324, 331 (Minn. Ct. App. 2007). Whether a fiduciary relationship exists is a fact question. Carlson v. SALA Architects, Inc., 732 N.W.2d 324, 331 (Minn. Ct. App. 2007) (citation omitted). And even if a relationship is not fiduciary per se, the facts of the case might create such a relationship. *Id.*

Here, CFS as a forensic-services provider owes a fiduciary duty to BHB. BHB in turn has a fiduciary relationship with the class plaintiffs it represents. The class plaintiffs entrusted BHB, and BHB in turn trusted CFS, with their evidence irreplaceable in the class-action litigation: the class plaintiffs' own devices contained data related to the class-action litigation itself.

### 6. Unjust Enrichment

"Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012). To establish a claim for unjust enrichment, Plaintiff must show that a party knowingly received something of value, not being entitled to the benefit of it, and under circumstances that would make it unjust to permit that party to retain it. *See, e.g.,*

*Southtown Plumbing, Inc. v. Har-Ned Lumber Co, Inc.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992). Unjust enrichment is an equitable remedy that depends on the unclean hands of the offender. *See First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981). Recovery under this claim is warranted when the recipient "was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully." *Id.*

If there is no enforceable agreement between BHB and CFS, BHB and the class plaintiffs are entitled to the return of the data related to the class-action litigation, as well as the devices containing this data. By holding the data and devices hostage, CFS has violated BHB and the class plaintiffs' right and need to full control of their evidence in the *Spectrum* litigation. It is unjust to allow CFS to continue in its attempt to force BHB and the class plaintiffs to choose between avoiding improper fees for computer-processing time and data hosting, or prosecuting the class-action litigation that the data and devices relate to without infringement by CFS.

## 7. Negligence

A party is negligent if it breaches a duty to another party, is the but-for and proximate cause of the other party's injury, and the other party suffered damages as a result of the breach. *See* Minn. CIVJIG 25.10, *Negligence*.

Here, as shown in greater detail above, BHB and the class plaintiffs have a right and need to full control of their evidence in the *Spectrum* litigation. As a forensic-services provider, CFS has a duty not to endanger, or use as a bargaining chip in negotiations, data and devices that constitute evidence in an active litigation. Even if CFS's denial of access to the data and devices, and threats to destroy the devices can be couched as negligent rather than intentional, CFS violated its most basic duties with obvious harm to BHB and

the class plaintiffs. If CFS is not prevented from denying access to the data and threatening to destroy the devices, this will be the proximate cause of damage to BHB and the class plaintiffs in the class-action litigation.

### 8. Negligent Misrepresentation

In a business context, negligent misrepresentation occurs when a party supplies false information to another person, fails to use reasonable care or competence in obtaining the information or communicating it, and the other party reasonably relied on the information to its detriment. *See* Minn. CIVJIG 57.20, *Negligent Misrepresentation*.

Here, as shown in greater detail above, BHB and the class plaintiffs relied on CFS's representation that it was a reputable services provider that would protect the class plaintiffs' data and devices; not hold their data and devices hostage to extort exorbitant fees from them.

### G. The Public's Interest in Allowing Attorneys and Litigants to Access the Civil-Justice System Would Be Harmed if the Injunction is Denied.

The final *Dataphase* factor addresses whether the public's interest would be harmed if an injunction is not granted. The public interest is not served by allowing a rapacious forensic-services provider to continue its pattern and practice of using civil litigants' and their counsel's duty to preserve evidence and meet other discovery obligations as leverage to obtain fees, no matter how unreasonable. What's more, the public interest is subverted when that company has a business model based on using fraudulent statements, misrepresentations, and deceptive practices to acquire the data and devices of litigants, then imposing ruinous fees to host the data—meanwhile, preventing both class-action counsel or the plaintiffs themselves from getting the data and devices back, unless they agree to pay these ruinous fees.

Because BHB and the class plaintiffs lack full control of the data and devices that comprise evidence in the class-action litigation, and because CFS has stated that it may destroy the devices at any time, the public's interest is overwhelmingly in favor or granting the injunction.

## CONCLUSION

Preliminary injunctions were designed for situations like ours. On one side, BHB and its class plaintiffs seek access to, and the return of, *their own data and devices*—which they need to fulfill their duties and remain part of the *Spectrum* litigation that led BHB to retain CFS. CFS has transformed a fees dispute—into one implicating the bedrock constitutional right to access our civil-justice system.

The *Dataphase* factors are all overwhelmingly in favor or BHB and the class plaintiffs. First, CFS's denial of access to the data and devices, and threatened destruction of the devices, and the abuse of the data and devices to extort exorbitant fees, is irreparable to BHB and the class plaintiffs because this violates their right and need to control their evidence in the *Spectrum* litigation. Second, the balance of harms supports BHB and the class plaintiffs because CFS is denying their right and need to control their evidence in the *Spectrum* litigation, while CFS would merely be stymied in its ability to continue fraudulently invoicing "hosting fees" that are orders of magnitude greater than the cost of preserving the data and devices. Third, BHB and the class plaintiffs have easily shown that they have at least a fair chance of prevailing on at least one of their 10 counterclaims against CFS. Fourth, the public's interest in allowing attorneys and litigants to access the civil-justice system unencumbered by third parties denying the

ability to do so, trumps whatever interest CFS has in being paid for computer-processing time and live-hosting fees, at the expense of the law firms and litigants who retain them.

Thus, because a preliminary injunction is necessary to safeguard BHB and its clients' interests, this Court should order CFS to: (1) return all devices of BHB's clients; (2) return all data, documents, and information of BHB's clients; and (3) preserve all data, documents, and information related to CFS's engagement with BHB, including all communications and billing records.

Respectfully submitted,

**HELLMUTH & JOHNSON**

Date:  November 8, 2022

By: */s/ Brendan M. Kenny*
  Brendan M. Kenny, #03911791
  8050 W. 78th St.
  Edina, MN 55439
  Phone: 952-941-4005
  Fax: 952-941-2337
  Email: bkenny@hjlawfirm.com

**ATTORNEYS FOR DEFENDANT**