UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Computer Forensic Services, Inc., and 360 Security Services, LLC, | Case No. 0:22-cv-02665-DWF-ECW |
| Plaintiffs, | Date Complaint filed: Aug. 16, 2022 |
| vs. | **DECLARATION OF KIMBERLY HANLON** |
| BraunHagey & Borden LLC, | |
| Defendant, | |

I, Kimberly M. Hanlon, declare:

1. I am an attorney licensed in Minnesota, and am co-founder and co-owner of Lucēre Legal, Inc., which helps business owners and their families with small business law, estate planning, probate administration, real estate, and litigation services in the greater Twin Cities Metro Area. I was also co-founder and co-owner of MoreLaw Minneapolis, LLC ("MoreLaw") which offered office and meeting spaces and support services, and Astute Legal Concierge, LLC ("Astute"), which was a sister-company to MoreLaw providing virtual-assistant, paralegal, billing, bookkeeping, and marketing services for attorneys.

2. I have personal knowledge of the matters in this declaration and could testify to them if called as a witness.

**MoreLaw Background and Forensic Issue**

3. In January 2011 we opened MoreLaw, and in December 2011 we opened Astute to provide additional services to attorneys. When we opened, we had only very recently transplanted from Oklahoma to Minnesota. I had not grown up here; I had not

gone to law school here; I had not worked here. I moved here because I had gone to the emergency room for asthma three times in the last year that I lived in Oklahoma, and the last time my lung function was recorded at less than 15%. Simply, the better choice for my health and longevity was to live in a climate that had better air quality for my particular asthma triggers, so we moved to Minneapolis and opened our business without having any preexisting network to market to.

4. Our office space was in the Flour Exchange Building, which is skyway connected to the federal courthouse. The cost of leasing the space and outfitting it with all the amenities needed to run a professional office for lawyers was very expensive. Our business grew slowly, and it was some years before we saw any returns on our initial investment. In fact, there were times when we had to watch every dollar and be very careful with our cashflow just to keep the doors open.

5. In 2013, MoreLaw and Astute served my own law firm, as well as the law firms for Satveer Chaudhary, Jessica McKinney, and many more attorneys as long-term clients.

6. On Wednesday, August 21, 2013, we hired a part-time contract paralegal to provide support work through MoreLaw and Astute. Before we hired him, I called the law firms at which he had previously worked and they said he was reliable, did good work, and they would have continued to employ him but for his moving away to Minnesota.

7. This paralegal did work for my own law firm, Satveer Chaudhary's law firm, Jessica McKinney's law firm, as well as some other attorneys in our space, and some administrative tasks for MoreLaw.

8. He worked in a physical office within our shared office space and used a computer that we had provided for him for most of his work, except that Jessica McKinney also had him work on a computer that belonged to her own firm and that was located in her physical office, within the shared office suite.

9. Based on some interactions with the paralegal, Mr. Chaudhary had become suspicious. He had a background check run on the paralegal that revealed prior felonies involving fraud.

10. I was out of the office at the time, and Mr. Chaudhary brought the background check results to the co-owner of MoreLaw and Astute (who is my mother), Sara Hanlon, on September 13, 2023.

11. Mr. Chaudhary recommended that MoreLaw/Astute look into whether or not the paralegal had stolen any client data, and Sara agreed. Mr. Chaudhary suggested that they contact Mark Lanterman since he had gone to a CLE in which Mr. Lanterman had been the presenter.

12. Mr. Chaudhary and my mother contacted CFS to find out whether the two computers the paralegal worked on could be forensically analyzed to determine whether the paralegal had improperly accessed or acquired private data.

13. The CFS employee that Mr. Chaudhary and my mother spoke with said they would take a preliminary look at the computers to see if there were any apparent red flags, and then provide MoreLaw with a price quote and a proposed scope of work.

14. The Astute computer and Jessica McKinney's computer that the paralegal had worked on were sent to CFS so they could do their initial work to give us the price quote.

15. When I returned to the office, my mom and Mr. Chaudhary apprised me of the situation and that they had contacted CFS. I said that I wanted the computers to go to a different vendor that I knew and had a good relationship with, but the two computers had already been handed off to CFS.

16. I later joined Mr. Chaudhary on a follow-up call with someone from CFS, and I asked how much CFS's services would cost. I was told that it was too soon to tell.

17. We heard nothing back from CFS regarding price. When we called CFS to retrieve the first computer (which Jessica McKinney needed for her practice), we were told that the initial imaging and preliminary work would be $300 per computer. MoreLaw paid the $600 for the initial imaging on September 16, 2013 (MoreLaw check number 1831), and CFS returned the computers along with a CD with the contents of the paralegal's personal Dropbox folder.

18. Upon getting the CD, I opened each folder and file to see if any sensitive client data had been transferred to the paralegal's personal Dropbox account. I discovered that one piece of sensitive client data had been transferred, which was a bank statement for a probate client of my own firm.

19. I issued a data breach notice to my client, who then closed that estate account and opened a new one.

20. I also notified the paralegal, the paralegal's Minnesota and out-of-state probation officers, and the local police about the data transfer.

# CFS's Exorbitant Charges

21. Around September 30, 2013, we received CFS's invoice for the work. It included an additional $1,718.75 for "Analysis" and $343.75 for "Submittal Preparation," for a total of $2,062.50. A true and correct copy of this invoice is attached as Exhibit 1. To this day, I have no idea what the 6.25 hours supposedly spent on "Analysis" means. Nor do I have the faintest idea what the 1.25 hours supposedly spent on "Submittal Preparation" actually entailed. We never received any submittal or analysis from CFS. We only received the computers back and a CD containing the data from the paralegal's Dropbox folder.

22. The invoice showed that the imaging was done on September 13, 2013 and that the "Analysis" and "Submittal Preparation" were done on September 16, 2013. This extra work was unexpected, unbudgeted for, and frankly shocking to us when we received it. We were completely blindsided by this, thinking that the $600 we paid was the full cost.

23. Before receiving the invoice, we never received a price quote or any other communication from CFS regarding fees, hourly rates, or terms of service. We never had an agreement as to any scope of work beyond the initial consultation. We were not financially able to pay the invoice. Had we known that CFS would charge us more than the $600, we would have never worked with them in the first place.

## Contact with Lanterman and CFS

24. On October 11, 2013, Bill Hanlon (my father, who helped with the business) emailed CFS to ask that no further work be done and that CFS delete the data from their files. A true and correct copy of this email is attached as Exhibit 2. This email was a

follow-up to a phone call from CFS where they asked what we wanted them to do with the data from the computers.

25. On January 3, 2014, CFS called Bill Hanlon about payment of the invoice. Bill Hanlon sent a follow-up email about the invoice. He sought to set up a payment plan beginning in March 2014, even though we were convinced that we should not have had to pay more than $600 for the imaging work that CFS did. He took a conciliatory approach because we wanted to avoid getting into a costly and time-consuming dispute with CFS over this invoice.

### MR. LANTERMAN'S OVERREACH

26. On Monday, January 13, 2014 we had a scheduled call with Mr. Lanterman to negotiate the outcome of the invoice dispute. At 4:28pm on Sunday, January 12, Mr. Lanterman emailed Mr. Chaudhary, apparently to try to get Mr. Chaudhary to pressure us to pay the invoice and agree to his terms prior to the scheduled call. According to Mr. Lanterman, all the work on the invoice was approved on our call with him, where Mr. Chaudhary and MoreLaw supposedly agreed that MoreLaw would pay for everything. Mr. Lanterman rejected Mr. Hanlon's proposed payment plan. He stated that CFS would "escalate" its "collection efforts" if MoreLaw didn't pay, including "a claim and lien against the data which will result in a public auction of your data."

27. A true and correct copy of the email string containing Mr. Lanterman and Bill Hanlon's emails is attached as Exhibit 3.

28. All of us were flabbergasted by Mr. Lanterman's email. I had never heard of any legitimate forensic company threatening to "auction" off an attorney's data, particularly knowing that the data is comprised of confidential client data, much of which

6

is sensitive in nature. The only "auctioneers" I know of are ransomware hackers, and I assume that the location of the auction would be on the Dark Web, rather than on the public internet. Even if the auction were on the public internet, the data itself would have been the confidential and sensitive client data from Jessica McKinney's law firm (a robust bankruptcy practice with hundreds of clients' social security numbers, banking information, and other sensitive information) and sensitive client data from the Astute computer, which would have less data overall since it was used more intermittently, but from a variety of attorneys' clients including some in family law cases, probate cases, estate planning cases, immigration cases, criminal cases, business cases, and litigation matters. In no forum would it be okay to sell this client data, and there is no buyer that would be an appropriate recipient of this client data.

29.  I responded to Mr. Lanterman's email via fax at 12:48pm the next day. A true and correct copy of my faxed letter is attached as Exhibit 4. Along with reiterating the lack of any contract or communication authorizing the outrageous $2,062.50 charge, I also reminded him that he had a duty to maintain the confidentiality of private data, and that he could attempt to place a lien on the computers themselves, but not on the data CFS extracted. I also informed him that retaining this data was a breach of confidentiality, and we were discussing his conduct with our attorneys. I told him that if he tried to place a lien on the private data that he holds (and which we requested that be deleted on October 11, 2013), we would pursue criminal prosecution and civil remedies. Of course, with our good faith offer to do a payment plan rejected, I stated that we would not pay any of the $2,062.50 extra.

30. Mr. Lanterman responded in a long email *39 minutes after I faxed my letter*. Attached as Exhibit 5 is a true and correct copy of Mr. Lanterman's email. He doubled-down on his threat, stating he had "no choice but to move forward with a lien and public auction." He claimed that Minnesota law provides that a lien on the private data "is lawful, valid, and enforceable." According to Mr. Lanterman, CFS was entitled to a lien on the private data because CFS somehow "enhanc[ed] its value." He cited a 1910 case that authorized a grain thresher to retain a portion of a farmer's grain he threshed as security for payment of the threshing bill. His email seemed to be cobbled together from some prior trial brief he had used or had access to. He then threatened: "Why you would want to make public the facts that More Law [sic] hired a paralegal with multiple felony convictions for identify theft and subsequently allowed that individual access to your client's data is beyond me." He concluded his email with, "as an attorney, you should know the law before you make threats."

31. All of us were aghast by Mr. Lanterman's response. It was especially concerning to us because the email could not have been a knee-jerk reaction to my letter. There was simply no way that Mr. Lanterman conducted legal research and attempted to apply the law to the facts of this dispute in the 39 minutes between receiving my letter and responding. Mr. Lanterman had his position well before receiving my letter.

### OUTREACH TO LAW ENFORCEMENT AND CONSUMER PROTECTION

32. I then contacted the Hennepin County Attorneys Office. I did so because I knew the section prosecutes various economic and financial crimes. I recall that I spoke to Mike Freeman, and he at first didn't believe that Mr. Lanterman had threatened to sell the private data. And when I showed him Mr. Lanterman's emails showing that he had,

8

he said that he was very surprised because Mr. Lanterman donates so much analysis time to the county and he just didn't think that threatening to sell client data would be something he would do.

33. I also filed a complaint with the Minnesota Attorney General's Office. Mr. Lanterman had a chance to respond, and he argued that I was simply a disgruntled, deadbeat client. The attorney handling the complaint at the AG's Office encouraged me to seek a temporary injunction.

34. I also filed a complaint with the Federal Trade Commission. I do not recall whether I ever got a response.

35. At some point, it became clear that Mr. Lanterman had dropped the matter. Although he never explicitly stated he would not pursue it, I never heard from him or CFS on the matter again.

36. My interactions with Mr. Lanterman and CFS regarding this invoice was a bizarre and non-sensical experience. Although the $2,062.50 extra was unjustified and unfair, my much larger concern was that Mr. Lanterman would have no compunction about exposing third-party private client data to the black market. For him to even threaten to do so is reprehensible. I believe that MoreLaw and our clients fared better than many based on our familiarity with the legal process and the resources at our disposal. I shudder to think how a legally unsophisticated client would fair against Mr. Lanterman.

37. After this incident, I noticed that Mr. Lanterman's marketing was everywhere, and he has ingratiated himself in all of our legal community institutions. He presented

himself, and seemed to be regarded as, the forensics expert in Minnesota. As far as I can tell, this perception remains to this day.

38. One final note. For several years, Mr. Lanterman has been a member of the Minnesota Lawyers Professional Responsibility Board. I believe that his presence on the Board is the most blatant hypocrisy. He is holding himself out as being a paragon of legal ethics all the while having a complete disregard for safeguarding client data knowing the enormous harm that would come to those legal clients if their data were allowed to be sold to the highest bidder on the internet.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 26, 2022

_____
Kimberly M. Hanlon