| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

| | |
|---|---|
| Mark Lanterman, Computer Forensic Services, | Case Type: Contract |
| | Judge Susan N. Burke |
| Plaintiffs, | |
| v. | **ORDER ADJUDICATING ATTORNEY'S LIEN** |
| Michael Roman Afremov, | |
| Defendant. | Court File No. 27-CV-12-22089 |

This matter came before the Honorable Susan N. Burke, Hennepin County District Court, on October 18, 2021, on Plaintiff Computer Forensic Service's Motion to Adjudicate Attorney's Lien. Janel Dressen, Esq., appeared for Plaintiff Computer Forensic Services. Jon Breyer, Esq., appeared on behalf of Ballard Spahr LLP. Due to the COVID-19 pandemic, the Court held the hearing remotely via Zoom.

## FACTS

**The Contingent Fee Arrangement**

On July 27, 2011, Computer Forensic Services ("CFS") and Fruth, Jamison & Elsass, PLLC ("FJE") entered into a 40% contingency-fee agreement for FJE to represent CFS in a dispute with Michael Afremov over approximately $800,000.00 of unpaid services. (Lanterman Decl., Ex. A.) Jon Breyer was the primary attorney on the file.

In January 2013, Mr. Breyer moved his practice to Lindquist & Vennum, LLP ("Lindquist"). On January 8, 2013, Lindquist sent CFS a 40% contingency fee agreement for its representation in connection with the lawsuit *Mark Lanterman and Computer Forensic Services*

1



*v. Michael Afremov* (Hennepin Court File No. 27-CV-12-22089). (Lanterman Decl., Ex. B.) Under the agreement, Lindquist agreed if there was no recovery in the case, Lindquist would charge no fees. Lindquist reserved the right to end the contingency fee arrangement by deciding not to appeal. The agreement provided:

> . . . Instead of the usual hourly fee arrangement (my normal hourly rate is $340), you have requested us to handle the case for a contingency fee. You agree to pay a fee contingent upon the outcome of the matter. The firm agrees the fee shall be 40% of all sums recovered from this time forward, including any settlement prior to trial, through verdict, award or decision. We will defend appeals. It will be left to our judgment whether we will take an appeal . . . In the event there is no recovery in this case, it is understood and agreed that we will charge no fees.

(Lanterman Decl., Ex. B.) Mr. Lanterman signed the agreement.

From February 3, 2014 to February 10, 2014, the parties tried the case to a jury before Judge Philip Bush. On February 11, 2014, the jury returned a verdict finding CFS and Mr. Afremov formed a contract, Mr. Afremov breached the contract, and Mr. Afremov owed CFS $104,568.75 in damages. On March 10, 2014, however, Judge Bush entered judgment as a matter of law in favor of Mr. Afremov, finding no contract existed. From March 25, 2014 to March 27, 2014, Judge Bush held a court trial on CFS's equitable claims.

**Lindquist Terminates the Contingent Fee Agreement and Bills CFS on an Hourly Basis**

On July 17, 2014, Judge Bush issued Findings of Fact, Conclusions of Law, and Order for Judgment in favor of CFS in the amount of $103,012.33. In his Order, Judge Bush questioned the credibility of Mr. Lanterman's testimony and the propriety of CFS's billing practices. Following this Order, Mr. Breyer told Mr. Lanterman Lindquist would not handle the appeal. (Lanterman Decl. ¶ 4; Madel Decl. ¶¶ 3, 9-10; Supp. Lanterman Decl., ¶¶ 3, 6-7; Cassandra B. Merrick Decl. ¶ 2.) Because of this, CFS retained appellate specialist Eric Magnuson and Chris

2

Madel of Robins Kaplan ("Robins"). (Lanterman Decl. ¶¶ 4-5; Madel Decl. ¶ 3; Supp. Lanterman Decl., ¶ 3; Merrick Decl. ¶ 2.)

Mr. Breyer claims Mr. Lanterman never gave Lindquist the opportunity to take the appeal. However, it is unlikely Mr. Lanterman voluntarily chose to pay Robins Kaplan $120,000.00 if Lindquist was willing to handle the appeal for free under the contingent fee agreement. Lindquist had performed about $375,000.00 of work on the first trial. (Breyer Decl. ¶ 6). A recovery under the contingency fee agreement was likely to require a costly appeal and retrial. It is more likely Mr. Lanterman asked Lindquist to handle the appeal and Lindquist refused, forcing Mr. Lanterman to hire Eric Magnuson.

Lindquist continued to work on the district court case, drafting post-trial motions and attempting to settle the case for zero dollars. If Lindquist could have convinced Judge Bush to grant a new trial or enter judgment for CFS, an appeal would have been unnecessary, and Lindquist could have recovered its 40% contingency fee.

On February 2, 2015, however, Judge Bush issued an order denying all post-trial motions. On February 4, 2015, as soon as proceedings in the district court concluded unsuccessfully and hope of recovering the 40% contingency fee without a costly appeal and retrial was gone, Lindquist immediately started billing CFS hourly for work it did for CFS. (Lanterman Decl., Ex. C, pp. 1-3.)

Over the next year, from February 2015 to April 2016, Lindquist sent CFS ten invoices billing CFS for work on an hourly basis. (Lanterman Decl. ¶¶ 6-7, Ex. C, I.)[1] During that year, CFS made payments to Lindquist on all ten invoices. *Id.* CFS paid Lindquist a total amount of

---

[1] Lindquist did not invoice CFS for 14.5 hours of work on taxation of costs issues from March 16, 2015 to April 6, but Lindquist sent invoices billing CFS on an hourly basis for all other work on this case from February 2015 to April 2016. (Lanterman Decl., Ex. C, I.)

3

$14,014.25 for work billed on an hourly basis. *Id.* Lindquist kept all the payments CFS made on the ten invoices from February 2015 to April 2016.[2]

On April 29, 2015, CFS appealed. On May 12, 2015, Mr. Afremov appealed. On April 18, 2016, the Court of Appeals reversed, finding Mr. Afremov breached the contract, and remanded for a new trial on damages only. Judge Bush had retired. On June 27, 2016, the case was assigned to Judge Susan Burke.

**On Remand, Mr. Breyer Unsuccessfully Tries to Get Mr. Lanterman to Agree to a Contingent Fee Agreement**

On remand, Lindquist began working on the second trial. Lindquist did not bill this work to CFS. On February 21, 2017, Mr. Lanterman and Mr. Breyer met to talk about the second trial. Mr. Lanterman told Mr. Breyer he wanted Chris Madel of Robins Kaplan to first chair the second trial and Mr. Breyer to second chair. (Supp. Lanterman Decl. ¶¶ 5-8; Madel Decl., ¶¶ 9-14.) Mr. Lanterman told Mr. Breyer he wanted Lindquist to continue to bill him hourly for Lindquist's work. *Id.*

Mr. Breyer tried to convince Mr. Lanterman the contingency fee arrangement was still in existence. (Supp. Lanterman Decl. ¶¶ 5-8; Madel Decl., ¶¶ 9-14.) However, Mr. Lanterman told Mr. Breyer Lindquist terminated the contingency fee when Lindquist refused to take the appeal and sent invoices with hourly billing for its work. *Id.* Mr. Lanterman was extremely disappointed Lindquist had refused to take his appeal and left him to pay for the extremely costly appeal on his own. *Id.* Mr. Lanterman told Mr. Breyer he felt Mr. Breyer abandoned him and left him out to dry. *Id.* Mr. Breyer's only response was that he could not have done the appeal because of the amount of time he had put into the case already and everyone thought CFS would lose. *Id.* When

---

[2]CFS paid Lindquist costs associated with the first trial as required under the contingency fee agreement regardless of the outcome. (Lanterman Decl. ¶ 17.)

4

Mr. Madel specifically asked Mr. Breyer why Lindquist billed CFS by the hour after the first trial, Mr. Breyer said that from his perspective, the "case was done, so we switched to hourly." *Id.*

After the February 21, 2017 meeting, Lindquist continued to work on the second trial and did not bill CFS for its work. On April 7, 2017, Mr. Breyer sent Mr. Lanterman a proposal for a new contingency fee agreement. This agreement proposed deducting the amount CFS paid for the appeal from the total recovery before the contingency fee was calculated. The agreement capped this reduction at $120,000.00. (Lanterman Decl., Ex. E.) Mr. Lanterman did not sign this agreement.

In Spring 2017, Mr. Madel left Robins and founded MADEL PA. On January 2, 2018, Ballard Spahr LLP acquired Lindquist. On March 23, 2018, Ballard recorded its last entry of work on the case. (Breyer Decl., Ex. 4.) At the end of May 2018, Mr. Breyer moved his practice to Kutak Rock LLP.

On May 22, 2018, Mr. Breyer sent an email to Mr. Madel to ask about a file transfer. Mr. Breyer asked Mr. Madel if Mr. Lanterman still wanted Mr. Breyer to be involved in the second trial. Mr. Breyer referenced the February 21, 2017 meeting where Mr. Lanterman told Mr. Breyer he wanted Mr. Madel to first chair and Mr. Breyer to second chair the second trial. Mr. Madel replied saying everything was staying as planned, referring to the arrangement stated at the February 21, 2017 meeting.[3]

---

[3] This cryptic email exchange concerns a file transfer and whether Mr. Breyer will participate in the second trial. The contingency fee agreement is not mentioned or contemplated. Moreover, Mr. Madel and Mr. Breyer reference the February 21, 2017 meeting where Mr. Lanterman told Mr. Breyer Linquist had terminated the contingent fee agreement. Any reference to "everything staying as planned" would at best mean Lindquist would continue to bill hourly after it had terminated the contingent fee agreement.

5

On May 31, 2018, Mr. Breyer sent Mr. Lanterman a new 40% contingency fee agreement with Kutack Rock. Mr. Lanterman did not sign this agreement. On June 4, 2018, Mr. Breyer sent Mr. Lanterman an email saying he believed the contingency fee agreement was still in place. (Breyer Decl., Ex. 8.) On June 5, 2018, Mr. Lanterman terminated Mr. Breyer's representation. (Lanterman Decl., ¶ 14.) On June 12, 2018, Mr. Breyer filed a notice of withdrawal of counsel. On June 15, 2018, William Slaughter, general counsel of Ballard Spahr, filed a UCC lien on any property CFS might acquire from this case.

**CFS Wins the Second Trial and Appeal**

From October 21, 2019 to October 23, 2019, CFS tried the case to a jury. On October 23, 2019, the jury found damages in the amount of $807,587.33. On March 13, 2020, the Court awarded CFS $13,113.36 in costs. On March 16, 2020, the Court awarded CFS pre-judgment interest at a rate of 6%. On May 12, 2020, Mr. Afremov appealed. On March 15, 2021, the Court of Appeals affirmed. On April 28, 2021, the Court of Appeals entered judgment. Mr. Afremov has agreed to pay CFS $1,600,000.00 in recognition of post-judgment interest. (Lanterman Decl. ¶ 18.)

On July 29, 2021, CFS filed a motion to adjudicate Ballard Spahr's attorney's lien and a supporting memorandum. On August 10, 2021, Ballard Spahr filed a responsive memorandum. On August 16, 2021, CFS filed a reply. On August 18, 2021, Ballard Spahr moved to file a Supplemental Declaration of Mr. Breyer as a Sur-reply. This Court grants Ballard Spahr's motion to file a sur-reply and has considered Mr. Breyer's supplemental declaration. On October 18, 2021, the Court heard oral arguments.

6

## ANALYSIS

There is a lot of money at stake in this Court's decision; but perhaps just as important are the reputations of very some good lawyers. Mr. Breyer has over 20 years of litigation experience. Mr. Breyer deservedly has an excellent reputation. For decades, Lindquist & Vennum, LLP was one of this legal community's premier law firms. After the firm's merger, Ballard Spahr, continued the heritage of the Lindquist firm providing exceptional service to their clients. One might ask, "how could this happen?" But the fact is this fee dispute did happen. This Order will no doubt disappoint Mr. Breyer and the firms he has been associated with, but it is a decision based upon the law and should not be interpreted as a commentary about their reputations or skills as lawyers.

Determining the proper amount of an attorney lien is within the discretion of the district court. Minn. Stat. § 481.13, subd. 1(c). "The value of the lien ordinarily is determined based on the terms of the fee provisions of a retainer agreement. When such an agreement does not exist, the amount of the lien is determined by the reasonable value of the services rendered." *Thomas A. Foster & Assocs. v. Paulson*, 699 N.W.2d 1, 6 (Minn. Ct. App. 2005) (citation omitted). Therefore, the Court must first determine whether a retainer agreement was in place.

CFS argues Lindquist terminated the contingency fee agreement when it refused to take the appeal on the first trial and began invoicing CFS on an hourly basis for its work. The Court agrees. The contingent fee agreement did not allow for any hourly billing. Lindquist refused to handle the appeal and began invoicing CFS on an hourly basis. Lindquist continued to bill CFS on an hourly basis for over a year. Lindquist sent CFS a total of ten invoices over the span of a year charging CFS for its work. Lindquist starting hourly billing CFS for its work two days after Judge Bush denied all post-trial motions ending proceedings in the district court. CFS made

7

payments on all ten invoices. Lindquist kept all of CFS's payments. From February 2015 to April 2016, CFS paid Lindquist $14,014.25 for work Lindquist performed for CFS on an hourly basis. Thus, Lindquist ended the contingency fee agreement when it decided to not appeal from the first trial and started billing CFS hourly for its work.

Ballard Spahr claims the contingent fee agreement was suspended during the year Lindquist sent invoices billing CFS hourly for Lindquist's work, and the contingent fee agreement resumed when Lindquist began work on the second trial. Ballard Spahr further claims Mr. Lanterman discharged Lindquist on June 5, 2018, and Lindquist is entitled to the quantum meruit value of its services under *Faricy. Faircy Law Firm, P.A. v. API, Inc. Asbestos Settlement Tr.*, 912 N.W.2d 652 (Minn. 2018). However, the contingent fee agreement in this case is unambiguous. It does not provide for hourly billing or for a suspension of the contingency agreement during an appeal and a resumption of the contingency fee on remand.

To the contrary, the agreement stated the contingency fee was in place of any hourly billing, "[instead] of the usual hourly fee arrangement (my normal hourly rate is $340), you have requested us to handle the case for a contingency fee." (Lanterman Decl., Ex. B.) Further, there is no provision for a suspension of the contingency agreement during an appeal, and a resumption of the contingency fee on remand. The agreement only gave Lindquist the option to decide whether to appeal. If Lindquist decided to not appeal, the contingency arrangement ended. If there was no recovery, Lindquist charged no fees, "It will be left to our judgment whether we will take an appeal . . . In the event there is no recovery in this case, it is understood and agreed that we will charge no fees." (Lanterman Decl., Ex. B.) The contingency fee agreement does not allow Lindquist to not appeal, bill CFS on an hourly basis for over a year, and still recover a contingency fee.

8

Because Lindquist ended the contingency fee agreement, the amount of the lien is determined by the reasonable value of the services rendered. *Thomas A. Foster & Assocs.*, 699 N.W.2d at 6. The lodestar method is the proper way to determine the reasonableness of attorney's fees. *Green v. BMW of N. Am., Ltd. Liab. Co.*, 826 N.W.2d 530, 535 (Minn. 2013). "Under the lodestar method, a court must first determine the number of hours reasonably expended on the litigation and then multiply those hours by a reasonable hourly rate." *Id.*, 826 N.W.2d at 536. The court must weigh "the time and labor required; the nature and difficulty of the responsibility assumed; the amount involved and the results obtained; the fees customarily charged for similar legal services; the experience, reputation, and ability of counsel; and the fee arrangement existing between counsel and the client." *Id.*

Lindquist's work under the contingency fee agreement ended on February 2, 2015 when Judge Bush denied all post-trial motions ending proceedings in district court. Before that, Lindquist may have convinced Judge Bush to grant a new trial or enter judgment in favor of CFS and recovered its 40% contingent fee. This explains why Lindquist did not bill hourly for any work before February 2, 2015. Lindquist started billing CFS on an hourly basis on February 4, 2015. Thus, Lindquist is entitled to the reasonable value of legal services Lindquist provided after February 2, 2015.

After February 2, 2015, Lindquist charged CFS a total of $77,592.10. Lindquist performed 235.13 hours of work. (Breyer Decl., Ex. 4.) Lindquist billed an hourly rate of $465.00 for Mr. Breyer's work, $220.00 for associate attorney work, $270.00 for paralegal work, and $200.00 for administrative work. *Id.* The number of hours worked and hourly rates charged are reasonable.

9

As to the time and labor required, Lindquist expended considerable time and effort on the case after February 2, 2015. Lindquist assisted Robins on the appeal of the first trial. On remand, Lindquist defended against Mr. Afremov's attempt to amend his answer and assert a counterclaim. Lindquist prepared the trial brief, proposed jury instructions, special verdict form, exhibits list, witness list, issued trial subpoenas and drafted all the motions *in limine* for the second trial. Lindquist identified and prepared all exhibits for trial.

As to nature and difficulty of the responsibility assumed, Lindquist assumed an assisting role on appeal providing information from the first trial. On remand, Mr. Breyer was to second chair the second trial. The Court of Appeals limited the issues to damages on two CFS invoices. Many of the difficulties Lindquist faced in the first trial were gone. Ballard argues Lindquist's work in the first trial made the work on appeal and remand easier. However, Lindquist chose to forgo recovery for that work when it ended the contingency fee agreement.

As to the amount involved and the results obtained, Lindquist's work contributed to the Court of Appeals reversing and remanding the case, a successful second trial and a judgment of $1,413,800.70.

As to the fees customarily charged for similar legal services, the fees Lindquist charged in this case are comparable or less than fees customarily charged for similar legal services.

As to the experience, reputation, and ability of counsel, Mr. Breyer has over twenty years of litigation experience and is a MSBA Certified Civil Trial Specialist. Mr. Breyer enjoys an excellent reputation and is an accomplished trial attorney. Moreover, Lindquist Vennum and Ballard Spahr are well-established, respected firms with reputations for providing exceptional legal representation of the highest quality. They have national practices and represent business

clients in cases far more complicated that this case. Mr. Breyer, Lindquist and Ballard are supremely competent, experienced and have excellent reputations.

As to the fee arrangement existing between counsel and the client, there was no fee agreement in place after February 2, 2015. The Court has discussed this factor at length.

Having considered the *Green* factors, the reasonable value of the services Lindquist rendered after February 2, 2015 is $77,592.10. 826 N.W.2d at 535. Ballard Spahr seeks fees in quantum meruit under the eight-factor test in *Faricy*, 912 N.W.2d at 658. However, *Faricy* applies where the client discharges an attorney with a contingent fee agreement. In this case, Lindquist exercised its option to end the contingency fee agreement. Lindquist then performed work for CFS without a retainer agreement. Thus, *Faricy* does not apply here.

Moreover, applying the two additional factors in *Faricy* does not change the outcome. As to the contribution of others and the timing of the termination, the success at the Court of Appeals and in the second trial were due mostly to the efforts of Robins Kaplan and MADEL PA. Although Lindquist supported Robins Kaplan's efforts on appeal and performed the pretrial work for the second trial, CFS terminated Mr. Breyer on June 5, 2018, over a year before the second trial began October 21, 2019. Ballard provides no documentation for work performed after March 23, 2018. Even considering all the *Faricy* factors, the reasonable value of the services Lindquist rendered after February 2, 2015 is $77,592.10.

CFS has already paid $14,014.25 for hourly fees billed after February 2, 2015. (Lanterman Decl. ¶ 16, Ex. C, I). Thus, Ballard Spahr is entitled to attorney's fees in the amount of $63,577.85 ($77,592.10 - $14,014.25).

After February 2, 2015, Lindquist also incurred $2,788.20 in costs. (Lanterman Decl., Ex. I). However, CFS already paid Lindquist $2,232.51 of these costs. (Lanterman Decl. ¶ 17, Ex. I).

11

CFS therefore owes Ballard Spahr costs in the amount of $555.69 ($2,788.20 - $2,232.51). Thus, the proper amount of Ballard Spahr's attorney lien is $64,133.54 ($63,577.85 + $555.69).

## ORDER

Accordingly**, IT IS HEREBY ORDERED**:

1. CFS must pay Ballard Spahr **$64,133.54** for attorney's fees and costs.

2. Ballard Spahr's attorney lien filed June 15, 2018 is extinguished.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

Dated: 1/3/2022

SUSAN N. BURKE
District Court Judge