IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Computer Forensic Services, Inc. and 360 Security Services LLC, | Case No. 22-cv-02665 (DWF/ECW) |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND TO SELECT ARBITRATOR PURSUANT TO 9 U.S.C. § 5** |
| v. | |
| BraunHagey & Borden LLC, | |
| Defendant. | |

The parties' signed contract contains a broad arbitration clause. Nevertheless, Defendant has done everything in its power to prevent this matter from being arbitrated. But Defendant has never challenged the validity of the arbitration clause, because it cannot. Accordingly—as they sought with their original petition in Minnesota state court before Defendant removed the action to this Court, presumably for the purpose of causing yet further delay—Plaintiffs respectfully request that this Court (1) order the parties to arbitrate this matter before the Honorable Magistrate Judge Jeffrey Keyes (Ret.), applying the rules of the American Arbitration Association; and (2) stay this Action pending that arbitration.

## BACKGROUND

### I.    The Agreement Between Plaintiffs and Defendant

Defendant is a law firm that was appointed to represent a class in a currently-pending lawsuit captioned *Spectrum Scientifics v. Celestron*, Case No. 5:20-cv-03642-

EJD (N.D. Cal.) ("the Spectrum Litigation") (Declaration of Mark Lanterman in Support

of Plaintiffs' Motion to Compel Arbitration and to Select Arbitrator Pursuant to 9 U.S.C.

§ 5 ("Lanterman Decl."), ¶ 2.) On June 1, 2021, Defendant engaged Plaintiffs, who are

experts in a variety of areas, to provide digital forensic and document scanning services.

(*Id*., Ex. 1.) The Engagement Agreement contains terms regarding Plaintiffs' pricing,

including the following:

> General Rates: 360-CFS charges for the time dedicated to the engagement on an hourly basis. The current hourly rates are set forth as follows: 360 Investigators, $150 per hour; Forensic Analysts, $325 per hour; Mark Lanterman, $425 per hour. The stated rates also apply to work performed outside of CFS' offices, including travel time, and internal peer review of work product.
>
> Project Specific Pricing: 360-CFS will charge a not-to-exceed cost for document scanning services of $0.20 per page. Additionally, 360-CFS will charge a flat fee of $300 for the secure transfer of documents and hard drives from the storage facility to 360-CFS's office.
>
> Preservation Fees: CFS charges a flat fee for the forensic preservation of digital media/electronic devices. Preservation includes the creation of a proprietary forensically sound bit-stream forensic image, and verification. The flat fee amount is dependent upon the media type and size. A brief listing of current preservation rates are as follows: for computer/laptop hard drives, $300-$750 per device, and for mobile devices (smartphones, tablets, etc.), $575 per device.
>
> Data Hosting: A monthly data hosting fee is assessed to the engagement. The data hosting fee is calculated based on the volume of data created by or provided to 360-CFS, to include forensic images. The current data hosting rate is $3.45 per GB of data per month. Data hosting charges will accrue immediately upon creation or receipt of project data. Data hosting may be terminated at any time after the start of data hosting invoicing. Termination is only effective if received in writing. All unpaid data hosting charges are due immediately upon termination. B&B understands and agrees to pay all data hosting charges.

Expedited Rates: In situations where work requests must be expedited, or performed outside of 360-CFS' normal business hours (M-F, 9AM-5PM CST), including holidays and weekends, 360-CFS will charge 1.5x the applicable hourly rate.

(*Id*., Ex. 1, p. 1–2.) The Engagement Agreement also contains terms regarding invoices and late payment or nonpayment, including that Plaintiffs reserve the right to declare property abandoned for nonpayment:

Invoices: 360-CFS will periodically submit invoices to B&B for any and all services performed or costs incurred on the project. 360-CFS reserves the right to withhold all productions until after payment for services is received. 360-CFS invoices are due upon receipt. 360-CFS must be notified in writing of any and all disputes regarding an invoice within 15 days of the date of the disputed invoice. 360-CFS billing records are the default record establishing an invoice. B&B acknowledges that if no disputative writing is received by 360-CFS within the 15-day period then all amounts under an invoice are due and owed to 360-CFS.

Late Payment/Non-payment: Invoices not paid promptly are subject to a late fee of 1.8% of the amount of the invoice per month for each month the invoice remains unpaid. 360-CFS reserves the right to cease work on the project or any other project on which 360-CFS is providing services to B&B if an invoice remains unpaid for a period of 30 days. 360-CFS reserves the right to withdraw from this engagement if its invoices remain unpaid for a period of 45 days. 360-CFS reserves the right to declare as abandoned any and all data and devices a customer has placed in our custody for a period greater than 60 days.

(*Id*., Ex. 1, p. 3.)

Finally, the Engagement Agreement contains an arbitration clause stating:

Any controversy, claim, or dispute arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, or relating otherwise to the firm's representation of Client, including the determination of the scope, jurisdiction or applicability of this agreement to arbitrate, shall be determined through binding arbitration in Minnesota by a sole arbitrator.

(*Id*., Ex. 1, p. 3–4.) Because nothing in the Engagement Agreement provides a mechanism for the selection of the "sole arbitrator," the appointment is reserved to this Court.

## II.     The Work Completed by Plaintiffs for Defendant

Before CFS can analyze any digital media, CFS must preserve it. (Lanterman Decl., ¶ 4.) In connection with the Spectrum Litigation, Defendant and/or its client identified twenty (20) electronic devices for forensic preservation. (*Id*., ¶ 5.) A CFS employee travelled onsite to the client's location in Bethel, Minnesota to pick-up the devices. (*Id*., ¶ 6.) The forensic preservation process creates a duplicate copy of the devices and is an accurate representation of the data contained on them. (*Id*., ¶ 7.)

The inaccessible devices were physically damaged, thus making attempts to recover data from them difficult. (*Id*., ¶ 9.) Defendant advised that several of the devices were damaged in a fire. (*Id*.) CFS, however, was ultimately able to recover data from a number of the fire-damaged devices. (*Id*.) In addition to the electronic sources, Defendant identified 48,483 pages of paper documents. (*Id*., ¶ 10.) These documents were subsequently scanned, enhanced, and produced to Defendant by 360. (*Id*.)

Following the successful preservation of the accessible devices outlined in Table 1, CFS provided an estimate to Defendant for its services on or around June 14, 2021. (*Id*., ¶ 11.) The estimate was for 6-10 hours per device to run approximately nineteen (19) search terms across the data set, and then produce responsive materials to BraunHagey's Relativity provider. (*Id*.) Based on the number of devices that would ultimately prove to be accessible, this estimate totaled between $21,450 and $35,750. (*Id*.) CFS's total

billing, including communications, analysis (e.g., search terms), data exports, email account preservations, iPhone repairs, and preservation costs, ultimately totaled $33,119.80. (*Id*.)

Joseph Lanterman, CFS's Director of Finance, notified Hunter Thomson, an attorney at Defendant, of the pending data hosting charges on September 23, 2021. (*Id*., ¶ 13.) Joseph Lanterman's email stated, "Please note that CFS continues to host a significant amount of data (the forensic images) on this project. We will need to begin billing for this hosting starting Oct. 1, 2021." (*Id*.) Mr. Thomson never responded to this email. (*Id*.)

On November 17, 2021, Ron Fisher, a Partner with Defendant, advised via email that CFS must continue to store the data and could not destroy the property, despite Defendant's refusal to pay for the same. (*Id*., ¶ 14.) Consequently, charges for hosting continue to accrue. (*Id*.) In total, CFS has preserved approximately 3,141 GB of data. (*Id*.) At the agreed upon rate in the Engagement Agreement ($3.45 per GB per month), this amounts to $361.20 per diem. (*Id*.) Interest has also accrued on the outstanding invoices at a rate of 1.8% per month past due. (*Id*., Ex. 1.) Both interest charges and data hosting fees have continued to accrue on a per diem basis. (*Id*., Ex. 1.)

Joseph Lanterman sent four (4) invoices on behalf of CFS and 360 to Mr. Thomson on July 7, 2021, July 27, 2021, August 4, 2021, and September 23, 2021. (*Id*., ¶ 15.) On August 4, 2021, CFS sent invoices containing additional billing information to Thomson. (*Id*.) CFS also followed up on the outstanding invoices on August 30, 2021. (*Id*.)

On September 3, 2021, Thomson responded to CFS's August 30, 2021 email saying "Got it. We'll circle back with you on Tuesday." (*Id*., ¶ 16.) This promised follow-up by Thomson never occurred. (*Id*..)

On October 8, 2021, CFS Chief Technology Officer Mark Lanterman followed up in an email to Matthew Borden and Thomson, both attorneys with Defendant, asking "Why haven't [CFS and 360's] invoices been paid." (*Id*., ¶ 17.)

On October 14, 2021, Mark Lanterman followed up again informing Borden and Thomson that "[Mark Lanterman] ha[s] left messages for both of you. If I don't hear from you this week, I intend to escalate. I would appreciate a response." (*Id*., ¶ 18.)

On October 14, 2021, Defendant finally responded, stating:

> Hunter has been in consistent contact with Joe Lanterman at your firm regarding these issues. […] The concern we have with the invoices is that Joe has confirmed that ComputerForensics has billed numerous hours that its computers were processing data as "analyst time." Billing computer time as analyst time is not industry standard, and our retainer agreement provides for payment for actual analyst time, not computer time. We are additionally concerned about the volume of hours billed without success in recovering any data, particularly when our subsequent vendor was able to recover data relatively quickly.

(*Id*., ¶ 19.) The Engagement Agreement provides that any billing dispute must be received in writing within a 15-day period. (*Id*., Ex. 1, p. 3.) Defendant did not provide any written dispute of these charges until October 14, 2021. (*Id*., ¶ 20.) This was approximately 99 days after CFS's first invoice, 71 days after the second CFS invoice, and 79 days after 360's invoice. (*Id*.) Defendant agreed in the Engagement Agreement that "that if no disputative writing is received by 360-CFS within the 15-day period then all amounts under an invoice are due and owed to 360-CFS." (*Id*., Ex. 1.) Defendant

accepted the invoices when it did not send a written dispute within 15 days. (*Id.*)

Furthermore, Defendant has not disputed the amounts owed to 360. (*Id.*) The outstanding

balance owed by Defendant to Plaintiffs as of November 3, 2022 is $201,782.70. (*Id.*, ¶

31.)

In connection with its removal to this Court, Defendant has asserted 10

counterclaims, all of which arise out of or relate to the parties' Engagement Agreement.

(Dkt. 1.)

## III.    Defendant's Delay Tactics

Through the fall of 2021, after Defendant refused to pay its invoices, Mark

Lanterman of CFS contacted Defendant on numerous occasions asking for Defendant to

agree to an arbitrator and an arbitration forum, including by email and by telephone.

(Lanterman Decl., ¶ 21.) He received no response. (*Id.*) Having heard no response from

Defendant regarding Plaintiffs' request for arbitration under the Engagement Agreement,

in November 2021, Mark Lanterman contacted former Minnesota Supreme Court Justice

James Gilbert inquiring whether he was available to arbitrate this dispute between the

parties under the rules of the American Arbitration Association. (*Id.*, ¶ 22.)

Ron Fisher of Defendant's firm wrote to Lanterman and Justice Gilbert's office on

November 17, 2021 advising that Defendant would not agree to arbitrate the dispute with

Justice Gilbert and that Defendant would agree to arbitrate the dispute before "JAMS or

the American Arbitration Association." (*Id.*, ¶ 23.) Plaintiffs' counsel sent a letter to

Defendant on December 2, 2021, again requesting that Defendant agree to arbitrate

before JAMS or AAA. (*Id.*, ¶ 24.) Fisher responded to Plaintiffs' letter on December 10,

2021, stating that Defendant was "willing to proceed to arbitration before either JAMS or the American Arbitration Association under those bodies' respective commercial arbitration rules, with the arbitrator selected in accordance with the respective rules of those arbitral bodies." (*Id.*, ¶ 25.)

On May 31, 2022, consistent with Fisher's statements that Defendant would agree to arbitrate before AAA or JAMS, Plaintiffs filed their Demand for Arbitration with JAMS and served the Demand for Arbitration on Defendant. (*Id.*, ¶ 26.)

On June 27, 2022, Fisher wrote to JAMS that Defendant did not agree to arbitrate the dispute with JAMS, to which counsel for Plaintiffs responded. (*Id.*, ¶ 27.) On July 11, 2022, JAMS determined that it would not arbitrate this dispute in the absence of agreement of the parties or a court order compelling arbitration. (*Id.*)

Counsel for Plaintiffs and Defendant continued to correspond regarding this dispute through July and August 2022. (*Id.*, ¶ 28.) Plaintiffs repeatedly asked Defendant to decide whether it would agree to arbitrate before AAA or JAMS, including in a phone call between counsel for the parties on July 20, 2022 and by emails between counsel for the parties on July 26, July 28, August 1, and August 12, 2022. (*Id.*) Because Defendant has refused to agree to an arbitration forum or an arbitrator since at least November 2021, Plaintiffs filed the state court action on August 16, 2022. (*Id.*, ¶ 29.) Plaintiffs then asked whether counsel for Defendant was authorized to accept service of the Complaint in the state court action. (*Id.*) Defendant's attorney, Mr. Kenny, advised he was not authorized to accept service of the Complaint in the state court action. (*Id.*) On August 29, 2022, pursuant to Minn. R. Civ. P. 4.05, mailed a request for waiver of service to Defendant.

(*Id.*, ¶ 30.) Defendant waived service on September 23, 2022. (*Id.*) Defendant then removed the State Court Action to this Court on the last possible date permissible under federal law, October 24, 2022. (*Id.*)

Despite its delays, Defendant has never challenged the validity of the arbitration clause or its applicability to this dispute.

## **LEGAL STANDARD**

The Federal Arbitration Act (the "FAA" or the "Act") provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Act reflects "a liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and is intended to "ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 219 (1985). *See also Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (the FAA requires courts to "rigorously enforce agreements to arbitrate"); *Faber v. Menard, Inc.*, 367 F.3d 1048, 1052 (8th Cir. 2004) ("There is a strong federal policy favoring arbitration.").

A party aggrieved by the refusal of another to arbitrate under a written agreement to do so may petition any United States district court for an order directing that such arbitration proceed in the manner provided for in that agreement. 9 U.S.C. § 4. Arbitration agreements are interpreted liberally, with any doubts resolved in favor of arbitration. *MedCam, Inc. v. MCNC*, 414 F.3d 972, 975 (8th Cir. 2005); *see also Moses H. Cone*, 460 U.S. at 24-25. "By its terms, the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the

9

(*Id.*, ¶ 30.) Defendant waived service on September 23, 2022. (*Id.*) Defendant then removed the State Court Action to this Court on the last possible date permissible under federal law, October 24, 2022. (*Id.*)

Despite its delays, Defendant has never challenged the validity of the arbitration clause or its applicability to this dispute.

## **LEGAL STANDARD**

The Federal Arbitration Act (the "FAA" or the "Act") provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Act reflects "a liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and is intended to "ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 219 (1985). *See also Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (the FAA requires courts to "rigorously enforce agreements to arbitrate"); *Faber v. Menard, Inc.*, 367 F.3d 1048, 1052 (8th Cir. 2004) ("There is a strong federal policy favoring arbitration.").

A party aggrieved by the refusal of another to arbitrate under a written agreement to do so may petition any United States district court for an order directing that such arbitration proceed in the manner provided for in that agreement. 9 U.S.C. § 4. Arbitration agreements are interpreted liberally, with any doubts resolved in favor of arbitration. *MedCam, Inc. v. MCNC*, 414 F.3d 972, 975 (8th Cir. 2005); *see also Moses H. Cone*, 460 U.S. at 24-25. "By its terms, the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the

parties to proceed to arbitration" regarding disputes falling within the scope of an

arbitration agreement. *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir.

2004) (citing *Byrd*, 470 U.S. at 218) (quotation marks omitted, emphasis in original).

**ARGUMENT**

**I.      The Parties' Claims Are Subject to Arbitration**

**A. The Parties Delegated the "Gateway" Issues of Arbitrability to the
Arbitrator.**

"The purpose of the FAA is to move the parties to an arbitrable dispute out of

court and into arbitration as quickly and easily as possible." *Koch v. Compucredit Corp.*,

543 F.3d 460, 463 (8th Cir. 2008) (citing *Moses H. Cone*, 460 U.S. at 22) (quotation

marks omitted). To accomplish this goal, "Congress provided a limited role for courts,

allowing them to consider only issues relating to the making and performance of the

agreement to arbitrate." *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388

U.S. 395, 404 (1967)) (quotation marks omitted).

Typically, when presented with a motion to compel arbitration pursuant to the Act,

a court must determine: (a) whether a valid arbitration agreement exists between the

parties; and (b) whether the specific dispute is within the scope of the agreement. *Pro

Tech*, 377 F.3d at 871 (citing *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)).

And because arbitration is a matter of contract, these substantive or "gateway" questions

of arbitrability are presumptively committed to judicial determination (as opposed to

determination by an arbitrator). *Id.* (citing *United Steelworkers v. Warrior & Gulf Nav.

Co.*, 363 U.S. 574, 582 (1960)). *See also Howsam v. Dean Witter Reynolds, Inc.*, 537

U.S. 79, 83 (2002) (the question whether the parties have submitted a particular dispute

to arbitration, *i.e.*, the question of arbitrability, is presumptively an issue for judicial

determination). However, where there is clear and unmistakable evidence the parties

intended to commit these substantive or "gateway" questions of arbitrability to an

arbitrator, a court may not decide these issues and must refer them to arbitration.

*Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th

Cir. 2014); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).

*See also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010).

　　　　Here, the Plaintiffs and Defendant agreed to arbitrate these "gateway" questions of

arbitrability:

> Any controversy, claim, or dispute arising out of or relating to this Agreement,
> or the breach, termination, enforcement, interpretation, or validity thereof, or
> relating otherwise to the firm's representation of Client, including the
> determination of the scope, jurisdiction or applicability of this agreement to
> arbitrate, shall be determined through binding arbitration in Minnesota by a
> sole arbitrator.

(*Id.*, Ex. 1, p. 3–4.) This constitutes a clear and unmistakable intent to delegate the

issue of arbitrability to the arbitrator. *Fallo*, 559 F.3d at 878; *FJM Props.*, 756 F.3d

at 1100. The Court must therefore compel the arbitration of the parties' claims, even

with respect to the "gateway question" of arbitrability.

**B. Even if the Parties Had Not Delegated the "Gateway" Issue of Arbitrability to the Arbitrator, A Valid Arbitration Agreement Exists Between the Parties and This Dispute is Within the Scope of That Agreement, and the Court Must Therefore Compel Arbitration.**

　　　　Even if the parties had not delegated the "gateway question" of arbitrability to the

arbitrator—and they have—the Court must still compel arbitration because: (a) a valid

arbitration agreement exists between the Plaintiffs and Defendant; and (b) this specific

dispute is within the scope of that agreement. Plaintiffs' Motion should therefore be

granted.

### 1. *A Valid Arbitration Agreement Exists Between the Parties.*

If the parties had not delegated the "gateway question" of arbitrability to the

arbitrator, this Court's first inquiry would be whether a valid arbitration agreement exists

between Plaintiffs and Defendant. *See Pro Tech*, 377 F.3d at 871 (citing *Bazzle*, 539 U.S.

at 452). And valid arbitration agreements exist between Plaintiffs and Defendant. The

validity of an arbitration agreement is determined by state contract law. *Lyster v. Ryan's*

*Family Steak Houses, Inc.*, 239 F.3d 943, 946 (8th Cir. 2001). But when making this

determination a court only applies general state contract law—in other words, a court

"may not invalidate an arbitration agreement under any state law applicable only to

arbitration provisions; instead, [a court] may apply only a state's general contract

defenses." *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 791 (8th Cir. 1998). And even

though courts apply state contract law in determining whether a binding agreement arose

between the parties, courts also take into account the federal policy favoring arbitration

when applying state law in this context. *See Caley v. Gulfstream Aerospace Corp.*, 428

F.3d 1359, 1368 (11th Cir. 2005) (citing *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th

Cir. 2004). *See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S.

614, 626 (1985) (when determining whether the parties agreed to arbitrate a dispute, a

court applies "the federal substantive law of arbitrability, applicable to any arbitration

agreement within the coverage of the Act.").

As detailed above, Defendant agreed to arbitrate any disputes that arose between it and Plaintiffs arising out of or relating to the Engagement Agreement between the parties.

### 2. This Specific Dispute is Within the Scope of the Parties' Agreements to Arbitrate.

If the parties had not delegated the "gateway question" of arbitrability to the arbitrator, this Court's second inquiry would be whether the specific dispute is within the scope of the parties' arbitration agreement. *See Pro Tech*, 377 F.3d at 871 (citing *Bazzle*, 539 U.S. at 452); *see also 3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1198-99 (8th Cir. 2008) (a court, rather than an arbitrator, will determine whether a particular dispute falls within the scope of an arbitration clause *unless* the parties provide otherwise). Here, the Engagement Agreement provides that "[a]ny controversy, claim, or dispute…including the determination of the scope, jurisdiction or applicability of this agreement to arbitrate, shall be determined through binding arbitration in Minnesota by a sole arbitrator." (Lanterman Decl., Ex. 1, p. 3–4.) Again, this constitutes a clear and unmistakable intent to delegate the issue of arbitrability to the arbitrator. *Fallo*, 559 F.3d at 878; *FJM Props.*, 756 F.3d at 1100.

But even if the parties had not delegated this issue to the arbitrator, this dispute is within the scope of the arbitration clause in question and the Court should therefore compel arbitration. A district court is required to send a claim to arbitration when presented with a broad arbitration clause "as long as the underlying factual allegations simply touch matters covered by the arbitration provision." *3M Co.*, 542 F.3d at 1199 (citing *Mitsubishi Motors*, 473 U.S. at 625 n.13). Arbitration clauses covering claims

"arising out of" or "relating to" a matter are broad arbitration clauses. *Parm v. Bluestem*

*Brands, Inc.*, 898 F.3d 869, 87 (8th Cir. 2018). "Indeed, such a provision constitutes the

broadest language the parties could reasonably use to subject their disputes to that form

of settlement, including collateral disputes that relate to the agreement containing the

clause." *Id*. (citing *Fleet Tire Serv. Of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619,

621 (8th Cir. 1997) (quotation marks and alterations omitted). Arbitration clauses

covering claims "regarding" a matter are also considered broad arbitration clauses. *See,*

*e.g., Litton Fin. Printing Div. v. N.L.R.B.*, 501 U.S. 190, 193-94 (1991). Any doubts

regarding the scope of arbitrable issues should be resolved in favor of arbitration.

*Mitsubishi Motors*, 473 U.S. at 626 (citing *Moses H. Cone*, 460 U.S. at 24-25).

## II. Given Defendant's Obstreperous Behavior in Identifying an Arbitrator to This Point, Plaintiffs Respectfully Request That the Court Appoint the Honorable Jeffrey J. Keyes (Ret.) as Sole Arbitrator.

When an underlying arbitration agreement is silent as to the selection of the

arbitrator, the Court may appoint one. 9 U.S.C. § 5[1]; *see also ACEquip Ltd. v. Am. Eng'g*

*Corp.*, 315 F.3d 151, 155 (2d Cir. 2003) (holding neither Federal Arbitration Act (FAA)

nor Connecticut law entitled subcontractor on defense contract to hearing on existence of

---

[1]    *See* 9 U.S.C. § 5 ("If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.").

agreement to arbitrate in contract before arbitrator was appointed upon the motion of the contractor and its assignee, where contractor and assignee showed existence of written agreement to arbitrate and lack of a method for appointing an arbitrator); *Meskill v. GGNSC Stillwater Greeley LLC*, 862 F. Supp. 2d 966, 977 (D. Minn. 2012) ("For the foregoing reasons, the Court concludes that even if Meskill were correct that the Arbitration Agreement mandated arbitration before the NAF, that forum's unavailability simply results in a 'lapse' under 9 U.S.C. § 5 that the Court must remedy by appointing a substitute arbitrator."); *Jones v. GGNSC Pierre LLC*, 684 F. Supp. 2d 1161, 1166-68 (D.S.D. 2010) (holding specification of National Arbitration Forum (NAF) rules in arbitration agreement was not integral to agreement, and thus Federal Arbitration Act (FAA) authorized and required court to appoint arbitrator when NAF was unavailable to hear dispute).

As the above facts show, Defendant has repeatedly thwarted all efforts to choose an arbitrator and actually proceed with arbitration. Accordingly, Plaintiffs respectfully request that the Court order the parties to arbitrate before Magistrate Judge Jeffrey J. Keyes (Ret.), a former judge of this Court, who is eminently qualified to arbitrate this dispute. Plaintiffs have included his curriculum vitae with this Motion, which demonstrates his qualifications for the role (Declaration of Cassandra Merrick, Ex. 1). Thus, pursuant to 9 U.S.C. § 5, Plaintiffs respectfully request that the Court order that Judge Keyes administer the arbitration, saving both parties' fees associated with administration by AAA or JAMS, and apply the rules of AAA in connection with the dispute, since Defendant previously objected to the filing of the arbitration with JAMS.

**III.   The Court Should Stay These Proceedings Pending the Outcome of the Parties' Arbitration.**

The FAA requires a district court to stay an action pending an arbitration rather than dismissing it. *SuperShuttle Int'l*, 653 F.3d at 769. *See also* 9 U.S.C. § 3 ("the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]"). The Court should therefore stay this proceeding pending the outcome of the parties' arbitration.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court compel the parties' claims to private arbitration before the Honorable Jeffrey J. Keyes (Ret.) applying the rules of the American Arbitration Association and stay these proceedings pending the outcome of that arbitration.

Dated:  <u>November 9, 2022</u>              **MADEL PA**

                                    */s/ Cassandra B. Merrick*
                                    Christopher W. Madel
                                    Cassandra B. Merrick
                                    800 Pence Building
                                    800 Hennepin Avenue
                                    Minneapolis, MN 55403
                                    Phone: (612) 605–0630
                                    Fax: (612) 326–9990
                                    cmadel@madellaw.com
                                    cmerrick@madellaw.com
                                    *Attorneys for Plaintiffs*