IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Computer Forensic Services, Inc. and 360 Security Services LLC, | Case No. 22-cv-02665 (DWF/ECW) |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| BraunHagey & Borden LLC, | |
| Defendant. | |

## INTRODUCTION

Defendant has taken this motion as an opportunity to publicly (and falsely) smear the reputation of Plaintiffs and their principals, focus on years-old disputes irrelevant to this matter, and ignore the facts underlying this case. Moreover, Defendant has intentionally delayed any substantive action in this matter since first being asked to arbitrate the parties' dispute in November 2021, entirely undermining the "emergency" relief Defendant seeks in this Motion. And, perhaps most critically, Defendant does not address the fact that the dispute between the parties is strictly arbitrable and cannot be substantively decided before this Court.[1] Nonetheless, Plaintiffs are willing to handle this issue rationally and are amenable to returning the at-issue devices to Defendant if

---

[1] Plaintiffs have filed their Motion to Compel Arbitration and supporting papers with a hearing date of December 22, 2022.

Defendant is ordered to post a bond or place into an escrow account the amount it currently owes Plaintiff, i.e., $201,782,70.[2]

## BACKGROUND[3]

### I. The Agreement Between Plaintiffs and Defendant

Defendant is a law firm that was appointed to represent a class in a currently-pending lawsuit captioned *Spectrum Scientifics v. Celestron*, Case No. 5:20-cv-03642-EJD (N.D. Cal.) ("the Spectrum Litigation") (Declaration of Mark Lanterman in Support of Plaintiffs' Response to Defendant's Motion to Preliminary Injunction ("Lanterman Decl."), ¶ 2.) On June 1, 2021, Defendant engaged Plaintiffs, who are experts in a variety of areas, to provide digital forensic and document scanning services. (*Id.*, Ex. 1.) The Engagement Agreement contains terms regarding Plaintiffs' pricing, including the following:

> General Rates: 360-CFS charges for the time dedicated to the engagement on an hourly basis. The current hourly rates are set forth as follows: 360 Investigators, $150 per hour; Forensic Analysts, $325 per hour; Mark Lanterman, $425 per hour. The stated rates also apply to work performed outside of CFS' offices, including travel time, and internal peer review of work product.

---

[2] This amount represents only the amounts presently owed to Plaintiffs by Defendant. The Engagement Agreement between the parties provides that the prevailing party may recover fees and costs of any action to enforce the Engagement Agreement, but Plaintiffs do not seek a bond to cover that amount here and will reserve argument with respect to that portion of the Engagement Agreement for arbitration, where this entire dispute properly belongs.

[3] This Background section is not drafted chronologically as is more standard in connection with motions before this Court as Plaintiffs wish to address the facts relevant to this dispute first and will then address the attacks by Defendants (which date back to 2013).

Project Specific Pricing: 360-CFS will charge a not-to-exceed cost for document scanning services of $0.20 per page. Additionally, 360-CFS will charge a flat fee of $300 for the secure transfer of documents and hard drives from the storage facility to 360-CFS's office.

Preservation Fees: CFS charges a flat fee for the forensic preservation of digital media/electronic devices. Preservation includes the creation of a proprietary forensically sound bit-stream forensic image, and verification. The flat fee amount is dependent upon the media type and size. A brief listing of current preservation rates are as follows: for computer/laptop hard drives, $300-$750 per device, and for mobile devices (smartphones, tablets, etc.), $575 per device.

Data Hosting: A monthly data hosting fee is assessed to the engagement. The data hosting fee is calculated based on the volume of data created by or provided to 360-CFS, to include forensic images. The current data hosting rate is $3.45 per GB of data per month. Data hosting charges will accrue immediately upon creation or receipt of project data. Data hosting may be terminated at any time after the start of data hosting invoicing. Termination is only effective if received in writing. All unpaid data hosting charges are due immediately upon termination. B&B understands and agrees to pay all data hosting charges.

Expedited Rates: In situations where work requests must be expedited, or performed outside of 360-CFS' normal business hours (M-F, 9AM-5PM CST), including holidays and weekends, 360-CFS will charge 1.5x the applicable hourly rate.

(*Id.*, Ex. 1, p. 1–2.) The Engagement Agreement also contains terms regarding invoices

and late payment or nonpayment:

Invoices: 360-CFS will periodically submit invoices to B&B for any and all services performed or costs incurred on the project. 360-CFS reserves the right to withhold all productions until after payment for services is received. 360-CFS invoices are due upon receipt. 360-CFS must be notified in writing of any and all disputes regarding an invoice within 15 days of the date of the disputed invoice. 360-CFS billing records are the default record establishing an invoice. B&B acknowledges that if no disputative writing is received by 360-CFS within the 15-day period then all amounts under an invoice are due and owed to 360-CFS.

Late Payment/Non-payment: Invoices not paid promptly are subject to a late fee of 1.8% of the amount of the invoice per month for each month the invoice remains unpaid. 360-CFS reserves the right to cease work on the project or any other project on which 360-CFS is providing services to B&B if an invoice remains unpaid for a period of 30 days. 360-CFS reserves the right to withdraw from this engagement if its invoices remain unpaid for a period of 45 days. 360-CFS reserves the right to declare as abandoned any and all data and devices a customer has placed in our custody for a period greater than 60 days.

(*Id*., Ex. 1, p. 3.)

Finally, the Engagement Agreement contains an arbitration clause stating:

Any controversy, claim, or dispute arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, or relating otherwise to the firm's representation of Client, including the determination of the scope, jurisdiction or applicability of this agreement to arbitrate, shall be determined through binding arbitration in Minnesota by a sole arbitrator.

(*Id*., Ex. 1, p. 3–4.)

## II.    The Work Completed by Plaintiffs for Defendant

Before CFS can analyze any digital media, CFS must preserve it. (Lanterman Decl., ¶ 4.) In connection with the Spectrum Litigation, Defendant and/or its client identified twenty (20) electronic devices for forensic preservation. (*Id*., ¶ 5.) A CFS employee travelled onsite to the client's location in Bethel, Minnesota to pick-up the devices. (*Id*., ¶ 6.) The forensic preservation process creates a duplicate copy of the devices and is an accurate representation of the data contained on them. (*Id*., ¶ 7.) Table 1 below provides a summary of the devices received, and whether CFS was able to extract data from them.

| Device Description | Serial Number | Device Accessible |
|---|---|---|
| iMac 20in 2.16 | QP7090X7VUW | Yes |
| Quantum FireBall SE IDE | 334820362479 | Yes |
| IBM DORS-32160 SCSI | 85G3683E596700S61 | Yes |
| Conner SFP1080S SCSI | EX988X6 | No |
| Quantum ProDrive LPS SCSI | 94641013 | No |
| Quantum ProDrive ELS SCSI | 9372103B3 | No |
| Quantum ProDrive ELS SCSI | 93209033 | No |
| Quantum ProDrive LPS SCSI | 142305410899 | No |
| Mad Dog External USB 2.0 | N/A | Yes |
| WD Caviar WD400 | WMAMA43_209 | No |
| Quantum ProDrive LPS SCSI | MK1030VH039C | No |
| Unknown Drive | Unknown | No |
| MacBookPro | C02NH2JCG3QK | Yes |
| DELL PowerEdge 6300 Server | Service Tag: HGV5A | Yes |
| iPhone SE A2275 | F17CQ9KZPLJY | Yes |
| iPhone 6 A1549 | C7JNTRL9G5MG | Yes |
| HP Prodesk 400 Tower | MXL440367X | Yes |
| IBM M Pro Tower | 23FY541 | Yes |
| Apple (Macintosh) Centris 650 Tower | FC338DOGCC5 | Yes |

*Table 1: Device Listing*

The inaccessible devices were physically damaged, thus making attempts to recover data from them difficult. (*Id.*, ¶ 9.) Defendant advised that several of the devices were damaged in a fire. (*Id.*) CFS, however, was ultimately able to recover data from a number of the fire-damaged devices. (*Id.*) In addition to the electronic sources outlined in Table 1, Defendant identified 48,483 pages of paper documents. (*Id.*, ¶ 10.) These

documents were subsequently scanned, enhanced, and produced to Defendant by 360. (*Id*.)

Following the successful preservation of the accessible devices outlined in Table 1, CFS provided an estimate to Defendant for its services on or around June 14, 2021. (*Id*., ¶ 11.) The estimate was for 6-10 hours per device to run approximately nineteen (19) search terms across the data set, and then produce responsive materials to BraunHagey's Relativity provider. (*Id*.) Based on the number of devices that would ultimately prove to be accessible, this estimate totaled between $21,450 and $35,750. (*Id*.) CFS's total billing, including communications, analysis (e.g., search terms), data exports, email account preservations, iPhone repairs, and preservation costs, ultimately totaled $33,119.80. (*Id*.)

Joseph Lanterman, CFS's Director of Finance, notified Hunter Thomson, an attorney at Defendant, of the pending data hosting charges on September 23, 2021. (*Id*., ¶ 13.) Joseph Lanterman's email stated, "Please note that CFS continues to host a significant amount of data (the forensic images) on this project. We will need to begin billing for this hosting starting Oct. 1, 2021." (*Id*.) Mr. Thomson never responded to this email. (*Id*.)

On November 17, 2021, Ron Fisher, a Partner with Defendant, advised via email that CFS must continue to store the data and could not destroy the property, despite Defendant's refusal to pay for the same. (*Id*., ¶ 14.) Consequently, charges for hosting continue to accrue. (*Id*.) In total, CFS has preserved approximately 3,141 GB of data. (*Id*.) At the agreed upon rate in the Engagement Agreement ($3.45 per GB per month),

this amounts to $361.20 per diem. (*Id*.) Interest has also accrued on the outstanding invoices at a rate of 1.8% per month past due. (*Id*., Ex. 1.) Both interest charges and data hosting fees have continued to accrue on a per diem basis. (*Id*., Ex. 1.)

Joseph Lanterman sent four (4) invoices on behalf of CFS and 360 to Mr. Thomson on July 7, 2021, July 27, 2021, August 4, 2021, and September 23, 2021. (*Id*., ¶ 15.) On August 4, 2021, CFS sent invoices containing additional billing information to Thomson. (*Id*.) CFS also followed up on the outstanding invoices on August 30, 2021. (*Id*.)

On September 3, 2021, Thomson responded to CFS's August 30, 2021 email saying "Got it. We'll circle back with you on Tuesday." (*Id*., ¶ 16.) This promised follow-up by Thomson never occurred. (*Id*.)

On October 8, 2021, CFS Chief Technology Officer Mark Lanterman followed up in an email to Matthew Borden and Thomson, both attorneys with Defendant, asking "Why haven't [CFS and 360's] invoices been paid." (*Id*., ¶ 17.)

On October 14, 2021, Mark Lanterman followed up again informing Borden and Thomson that "[Mark Lanterman] ha[s] left messages for both of you. If I don't hear from you this week, I intend to escalate. I would appreciate a response." (*Id*., ¶ 18.)

On October 14, 2021, Defendant finally responded, stating:

> Hunter has been in consistent contact with Joe Lanterman at your firm regarding these issues. […] The concern we have with the invoices is that Joe has confirmed that ComputerForensics has billed numerous hours that its computers were processing data as "analyst time." Billing computer time as analyst time is not industry standard, and our retainer agreement provides for payment for actual analyst time, not computer time. We are additionally concerned about the volume of hours billed without success in

recovering any data, particularly when our subsequent vendor was able to recover data relatively quickly.

(*Id*., ¶ 19.) The Engagement Agreement provides that any billing dispute must be received in writing within a 15-day period. (*Id*., Ex. 1, p. 3.) Defendant did not provide any written dispute of these charges until October 14, 2021. (*Id*., ¶ 20.) This was approximately 99 days after CFS's first invoice, 71 days after the second CFS invoice, and 79 days after 360's invoice. (*Id*.) Defendant agreed in the Engagement Agreement that "that if no disputative writing is received by 360-CFS within the 15-day period then all amounts under an invoice are due and owed to 360-CFS." (*Id*., Ex. 1, p. 3.) Defendant accepted the invoices when it did not send a written dispute within 15 days. (*Id*.) Furthermore, Defendant has not disputed the amounts owed to 360. (*Id*., Ex. 1.) The outstanding balance owed by Defendant to Plaintiffs as of November 3, 2022 is $201,782,70. (*Id*., ¶ 37.)

## III.    Defendant's Delay Tactics

Through the fall of 2021, after Defendant refused to pay its invoices, Mark Lanterman of CFS contacted Defendant on numerous occasions asking for Defendant to agree to an arbitrator and an arbitration forum, including by email and by telephone. (Lanterman Decl., ¶ 21.) He received no response. (*Id*.) Having heard no response from Defendant regarding Plaintiffs' request for arbitration under the Engagement Agreement, in November 2021, Mark Lanterman contacted former Minnesota Supreme Court Justice James Gilbert inquiring whether he was available to arbitrate this dispute between the parties under the rules of the American Arbitration Association. (*Id*., ¶ 22.)

Ron Fisher of Defendant's firm wrote to Lanterman and Justice Gilbert's office on November 17, 2021 advising that Defendant would not agree to arbitrate the dispute with Justice Gilbert and that Defendant would agree to arbitrate the dispute before "JAMS or the American Arbitration Association." (*Id*., ¶ 23.) Plaintiffs' counsel sent a letter to Defendant on December 2, 2021, again requesting that Defendant agree to arbitrate before JAMS or AAA. (*Id*., ¶ 24.) Fisher responded to Plaintiffs' letter on December 10, 2021, stating that Defendant was "willing to proceed to arbitration before either JAMS or the American Arbitration Association under those bodies' respective commercial arbitration rules, with the arbitrator selected in accordance with the respective rules of those arbitral bodies." (*Id*., ¶ 25.)

On May 31, 2022, consistent with Fisher's statements that Defendant would agree to arbitrate before AAA or JAMS, Plaintiffs filed their Demand for Arbitration with JAMS and served the Demand for Arbitration on Defendant. (*Id*., ¶ 26.)

On June 27, 2022, Fisher wrote to JAMS that Defendant did not agree to arbitrate the dispute with JAMS, to which counsel for Plaintiffs responded. (*Id*., ¶ 27.) On July 11, 2022, JAMS determined that it would not arbitrate this dispute in the absence of agreement of the parties or a court order compelling arbitration. (*Id*.)

Counsel for Plaintiffs and Defendant continued to correspond regarding this dispute through July and August 2022. (*Id*., ¶ 28.) Plaintiffs repeatedly asked Defendant to decide whether it would agree to arbitrate before AAA or JAMS, including in a phone call between counsel for the parties on July 20, 2022 and by emails between counsel for the parties on July 26, July 28, August 1, and August 12, 2022. (*Id*.) Because Defendant

has refused to agree to an arbitration forum or an arbitrator since at least November 2021, Plaintiffs filed the state court action on August 16, 2022. (*Id*., ¶ 29.) Plaintiffs then asked whether counsel for Defendant was authorized to accept service of the Complaint in the state court action. (*Id*.) Defendant's attorney, Mr. Kenny, advised he was not authorized to accept service of the Complaint in the state court action. (*Id*.) On August 29, 2022, pursuant to Minn. R. Civ. P. 4.05, Plaintiffs mailed a request for waiver of service to Defendant. (*Id*., ¶ 30.) Defendant waived service on September 23, 2022. (*Id*.) Defendant then removed the State Court Action to this Court on the last possible date permissible under federal law, October 24, 2022. (*Id*.)

## ARGUMENT

### I. Plaintiffs Will Return the At-Issue Devices if Defendant Will Post a Bond or Escrow Account Totaling the Amount in Dispute.

As noted in the Introduction, Plaintiffs are willing to return the at-issue devices to Defendant if Defendant will post a bond or place in an escrow account the amount they are seeking in connection with Defendant's breach of the Engagement Agreement. Although Defendant is seeking an injunction here, Defendant nowhere in its brief refers to the requirement that it post a bond or admit that the Federal Rules require that it post a bond (*see generally* Dkt. 17). "Federal Rule of Civil Procedure 65(c) provides that a district court 'may issue a preliminary injunction ... *only* if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.'" *Paisley Park Enterprises, Inc. v. Boxill*, 253 F. Supp. 3d 1037, 1052 (D. Minn. 2017) (emphasis added). The

amount of the bond required by Rule 65(c) is in the discretion of the district court. *Id*.

(citing *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989)); *see also*

*Rathmann Group*, 889 F.2d at 789 ("Although we allow the district court much discretion

in setting bond, we will reverse its order if it abuses that discretion due to some improper

purpose, or otherwise fails to require an adequate bond or to make the necessary findings

in support of its determinations.") (citing *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir.

1991)).

     Here, Plaintiffs' outstanding invoices to Defendant currently total $201,782,70.

(Lanterman Decl., ¶ 37.) And although the parties' Engagement Agreement provides that

the prevailing party is entitled to recover "all attorneys' fees (including if 360-CFS is the

prevailing party, the value of the time of all professionals of our firm who perform

services in connection with the dispute, computed at their normal billing rates), all

experts' fees and expenses and all costs (whether or not these costs would be recoverable

under the Minnesota Code of Civil Procedure or other applicable law) that may be

incurred in obtaining or collecting any judgment and/or arbitration award, in addition to

any other relief to which that party may be entitled" (Lanterman Decl., Ex. 1, p. 3-4), for

purposes of resolving this portion of the dispute, Plaintiffs will not demand a bond to

cover such fees and costs at this time and will reserve their right to seek such fees and

costs upon resolution of this dispute.

## II. The Dispute as to Defendant's Devices is Arbitrable and Not Properly Before this Court.

If Plaintiffs' proposal is not acceptable to Defendant, then Defendant is out of luck with respect to seeking any injunctive remedy before this Court. In the Eighth Circuit, "a preliminary injunction may be granted in a case otherwise subject to arbitration *only where* the relevant contract contemplates such relief and it can be granted without addressing the merits of the underlying arbitrable dispute." *Signus Med., LLC v. Ilion Med., LLC*, No. CV 12-2916 (DWF/TNL), 2012 WL 12884406, at *2 (D. Minn. Dec. 10, 2012) (emphasis added) (citing *Manion v. Nagin*, 255 F.3d 535, 538 (8th Cir. 2001); *Peabody Coalsales Co. v. Tampa Elec. Co.*, 36 F.3d 46, 47 (8th Cir. 1994)).

For example, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey*, 726 F.2d 1286, 1292 (8th Cir. 1984), the Eighth Circuit held that "where the [FAA] is applicable and no qualifying contractual language has been alleged, the district court errs in granting injunctive relief." "[T]he judicial inquiry requisite to determine the propriety of injunctive relief necessarily would inject the court into the merits of issues more appropriately left to the arbitrator." *Id*. Similarly, in *Peabody Coalsales Co. v. Tampa Electric Co.*, 36 F.3d 46, 47 (8th Cir.1994), both parties moved for an order compelling arbitration of a contract dispute. The plaintiff also requested a preliminary injunction requiring continued performance of the contract until disposition of the case on arbitration. *Id*. The district court denied the motion and the plaintiff appealed. *Id*. The Eighth Circuit reversed the district court, finding that the contract contained "qualifying contractual language," meaning "language which provides the court with clear grounds to

grant relief without addressing the merits of the underlying arbitrable dispute." *Id*. at 47

n. 3. And in *Manion v. Nagin*, 255 F.3d 535, 538, 539 (8th Cir.2001), the plaintiff sought

a preliminary injunction, arguing qualifying contractual language existed where the

contract stated that "either party is entitled to injunctive relief in case of any breach," and

elsewhere provided "[the agreement to arbitrate] is without prejudice to the right of a

party under applicable law to request interim relief directly from any court...." *Id*. at 538.

The Eighth Circuit rejected this argument, reasoning that the contract only granted the

ability to request injunctive relief and did not mandate that the parties continue their

specified obligations during arbitration. *Id*. at 539. The Eighth Circuit also reasoned that

it could not grant injunctive relief without examining the merits of the case, a task

statutorily reserved to the arbitrators. *Id*.

Here, the Engagement Agreement is silent with respect to injunctive relief,

providing the parties with no basis to seek injunctive relief outside of the general

requirement that "[a]ny controversy, claim, or dispute arising out of or relating to this

Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, or

relating otherwise to the firm's representation of Client, including the determination of

the scope, jurisdiction or applicability of this agreement to arbitrate, shall be determined

through binding arbitration in Minnesota by a sole arbitrator." (*See* Lanterman Decl., Ex.

1, p. 3.) Therefore, injunctive relief is beyond the purview of this Court. The matter—as

sought in Plaintiffs' State Court Complaint, removed here, and as requested in Plaintiffs'

Motion to Compel Arbitration—should be sent to arbitration.

**III.    Defendant Fails to Meet its Burden Under the *Dataphase* Standards.**

Even if the Court reaches the substance of this Motion, Defendant is not entitled to a preliminary injunction. The Court considers four primary factors in determining whether a temporary restraining order should be granted: (1) the threat of irreparable harm to the moving party; (2) the likelihood of the moving party's success on the merits; (3) the state of balance between the alleged irreparable harm and the harm that granting the injunction would inflict on the other party; and (4) the public interest. *Lightfoot v. Jewell*, No. CIV. 13-2985 DWF/JJK, 2013 WL 6511852, at *3 (D. Minn. Dec. 12, 2013) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). "A preliminary injunction is an extraordinary remedy." *Lightfoot*, 2013 WL 6511852, at *3 (citing *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987)). "The party requesting the injunctive relief bears the 'complete burden' of proving all of the factors listed above." *Lightfoot*, 2013 WL 6511852, at *3 (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987)).

> **A.    Defendant's Failure to Identify Irreparable Harm Plus Its Gamesmanship and Delay in Bringing this Action Before Any Decisionmaker Undermines This Motion.**

Here, Plaintiffs have provided repeated assurances that they are preserving and will continue to preserve Defendant's devices (despite Defendant's abandonment of the same), and Defendant can offer no evidence of irreparable harm it will face if the devices are not returned to them. Indeed, BraunHagey is in possession of the majority of the data that CFS has preserved and *all* of the documents that 360 scanned in connection with this representation, which CFS and 360 did before receiving payment because of

BraunHagey's representations of urgency at the time (and which CFS now regrets). (Lanterman Decl., ¶ 12.) And while obliquely stating that irreparable harm will come if CFS maintains the devices and may harm Defendant's ability to prosecute the Spectrum Litigation, Defendant offers no sworn declaration or statement regarding any impairment of Defendant's prosecution of that matter. (*See* Dkt. 17 at 11–17.)[4]

Further, courts repeatedly find that a party's delay in seeking relief "negates a finding of irreparable harm." *Ng v. Bd. of Regents of Univ. of Minnesota*, No. 21-CV-2404 (SRN/BRT), 2022 WL 602224, at *6 (D. Minn. Mar. 1, 2022) (citing *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999) (affirming district court's denial of request for a preliminary injunction in part because plaintiff's delay in asserting his rights "belies any claim of irreparable injury pending trial"); *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (affirming district court's denial of a preliminary injunction when plaintiff failed to seek relief "for a period of seventeen months"); *CHS, Inc. v. PetroNet, LLC*, Civ. No. 10-94 (RHK/FLN), 2010 WL 4721073, at *3 (D. Minn. Nov. 15, 2010) (finding no irreparable injury after a

---

[4] This is, of course, even though Plaintiffs would be well within their rights to assert a lien against the data and devices; its authority to do so has been approved by courts in precisely these circumstances. See Lanterman Decl., Ex. 2, *Extrusion Dies Industries, LLC et al., v. Computer Forensic Services, Inc. et al.*, (4th Jud. Dist., Minn., Court File No. 27-CV-09-6284, Aug. 18, 2009), at *13 ("By threshing the plaintiff's crop for her, the defendant in *Gordon* was extracting the grain from the chaff. The defendant did not create or modify the grain; he merely made it usable and accessible. It was the grain that was valuable, not the chaff. Likewise, in this case, the service CFS performed for Fredrikson was to extract the data from the images. It used special tools and expertise, just as the *Gordon* defendant used a threshing machine. The fact that CFS did not create or modify the data is not dispositive; it put the data in usable and accessible form. Therefore, under *Gordon*, the Court declares that CFS's lien on the data, and the resulting sale, were lawful, valid, and enforceable.")

seven-month delay); *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*, Civ. No. 3:09-CV-00390-L, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) (finding delay of five months to seek injunctive relief undermined claim of irreparable injury); *Cafferty v. Trans World Airlines, Inc.*, 488 F. Supp. 1076, 1080 (W.D. Mo. 1980) (holding that "[t]he clearest reason for denying the injunction" is that a preliminary injunction would restore "a status quo which has been dead for more than a year prior to the filing of suit"); *cf. Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (holding delay to seek a stay unreasonable when petitioner waited maximum time to file a certiorari petition and waited until 20 days after filing the petition to seek the stay).

Here, the facts show that through 2021, Defendant refused to respond to Plaintiffs' requests that it jointly select an arbitrator with Plaintiffs. On that basis, Plaintiffs reached out to a potential arbitrator. Only then did Defendant respond and state that it would not arbitrate the dispute with Plaintiffs' selected arbitrator, the Honorable Justice James Gilbert (Ret.). Plaintiffs then asked whether Defendant would arbitrate in front of JAMS or AAA. Defendant said it would arbitrate with either, but when Plaintiffs filed with JAMS, Defendant said it refused to arbitrate with JAMS. Then the parties spent time trying to reach agreement on terms of an arbitration. Reaching an impasse, counsel for Plaintiffs asked whether Defendant's counsel was authorized to accept service of the Complaint in the State Court Action to compel arbitration; Defendant would not authorize its counsel to accept such service. So Plaintiffs mailed a waiver of service of summons form to Defendant. Defendant waived service on September 23, 2022. Then, on the last possible date, Defendant removed the State Court Action to this Court. This

gamesmanship is dilatory, counterproductive, and shows that any "emergency" is of Defendant's own making. The Spectrum Litigation has been pending throughout this period of time and Defendant's only actions have been to thwart judicial resolution of the dispute.

If the court finds that the movant has failed to show irreparable harm, the motion for preliminary injunction should be denied regardless of the analysis of the remaining factors. *See Waters v. Cafesjian Fam. Found., Inc.*, No. CIV. 12-648 RHK/LIB, 2012 WL 2904806, at *3 (D. Minn. June 27, 2012), report and recommendation adopted, No. CIV. 12-648 RHK/LIB, 2012 WL 2906573 (D. Minn. July 16, 2012) (citing *Internet Inc. v. Tensar Polytechnologies, Inc.*, Civ. No. 05–317 (RHK/ABJ), 2005 WL 2453170, at *4–5 (D.Minn. Oct. 3, 2005) (Kyle, J.) (stating that if a plaintiff fails to "prove irreparable harm, its request for a preliminary injunction must be denied without regard to the remaining Dataphase factors."); *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.2003) (finding that the failure to show irreparable harm is "an independently sufficient ground upon which to deny" injunctive relief); *Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir.1996) ("the failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction")).

### B. The Balance of Harms

As discussed above, Defendant have identified here no sufficient evidence of harm. On one hand, Defendant claims it suffers harm because storage charges continue to accrue as Plaintiffs store the devices and data at issue, while arguing on the other hand that they are going to be harmed because Plaintiffs will cease to store the data and

devices. This, of course, ignores the fact that it is Defendant that has abandoned the devices and data under the contract in addition to the numerous assurances from Plaintiffs that they will continue to store the devices and data safely. If this Motion is granted, however, Plaintiffs will continue to be denied their contracted-for arbitration forum and, if no bond is required, may lose their monetary remedy should Defendant be unable to pay.

### C. Defendant Will Not Succeed on the Merits.

As discussed above, because this Motion requires an analysis of the merits of the underlying arbitrable dispute, the Motion is not properly before this Court. This position which is further supported by the nature of Defendant's ten counterclaims alleged. In any event, Defendant is not likely to prevail on the merits of its ten counterclaims, all of which are based upon CFS's conduct that is contemplated by the parties' Engagement Agreement (which Defendant first breached by failing to pay).

Specifically, the nexus between Defendant's counterclaims is that CFS has retained some (although not all) of the devices Defendant placed in its custody, and that CFS's position is that it was no longer bound by any confidentiality agreement. Defendant's motion conveniently fails to address that the parties' Engagement Agreement provides that 1) "Confidentiality will not survive a breach of this agreement by B&B" and 2) "360-CFS reserves the right to declare as abandoned any and all data and devices a customer has placed in our custody for a period greater than 60 days." (Lanterman Decl., Ex. 1, pp. 1, 3.) In other words, Defendant understood and agreed that CFS is permitted to do exactly what it has done here. Minnesota law supports this

position. (Lanterman Decl., Ex. 2.) But that has not stopped Defendant from now complaining, after delaying resolution of this dispute for more than one year, that CFS's exercise of its contractual rights is somehow improper.

Citing the parties' Engagement Agreement, Defendant alleges that CFS "intended to be unbound from the duty of confidentiality, and deny access to the data and devices, and threaten to destroy the class plaintiff's devices, to force BHB and the plaintiffs to pay CFS whatever it demanded, without heed to the agreement's terms." In reality, CFS's conduct shows just the opposite. Indeed, prior to CFS realizing that Defendant was not going to pay CFS, CFS, at Defendant's direction, returned specific data to Defendant. (Lanterman Decl., ¶ 12.) Moreover, CFS submitted data representing CFS-360's work product to Defendant. (*Id.*, ¶ 12.) CFS did so because it understood that time was of the essence. These facts stand in contrast to Defendant's claim that CFS had an ulterior motive—to simply take the devices for ransom. Instead, this demonstrate that CFS acted in good faith, provided devices and data back to Defendant when instructed, and then, when Defendant failed to pay and to enter into negotiations to resolve the dispute with CFS, only then did CFS act in accordance with the contract as a last resort.

To the extent that some of Defendant's counterclaims request relief in tort beyond potential breach of contract claims, such claims are barred because of the economic loss doctrine. *Wild v. Rarig*, 234 N.W.2d 77, 789 (Minn. 1975) (party is limited to contract damages unless the breach "constitutes or is accompanied by an independent tort"). Here, the parties Engagement Agreement specifically limits damages to "any amounts paid to

19

360-CFS by B&B…" Consequently, such claims will fail because Defendant has not paid CFS anything.

Lastly, several of Defendant's counterclaims are not likely to succeed because they are mooted by the relief CFS is requesting here. As noted above, Plaintiffs are amenable to returning the at-issue devices to Defendant if Defendant is ordered to post a bond or place into an escrow account the amount of $201,782,70. Consequently, if this relief is granted, the majority of Defendant's counterclaims will be rendered moot.

### D. The Public Interest

Here, the overwhelming public interest lies in the in arbitration of disputes in which the parties have agreed to arbitrate. *Dumont v. Saskatchewan Gov't Ins. (SGI)*, 258 F.3d 880, 886 (8th Cir. 2001) ("in light of the strong federal policy in favor of arbitration, any doubts concerning waiver of arbitrability should be resolved in favor of arbitration."); *Simitar Ent., Inc. v. Silva Ent., Inc.*, 44 F. Supp. 2d 986, 992 (D. Minn. 1999) ("These provisions manifest a strong Federal policy in favor of enforcing arbitration agreements."); *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 800 (8th Cir. 2005) ("There is a strong national policy in favor of arbitration.") (citing *Dobbins v. Hawk's Enters.*, 198 F.3d 715, 717 (8th Cir. 1999).

Defendant's attempts to evade arbitration of this dispute, in addition to the Eighth Cicrcuit's law requiring arbitration with respect to this injunctive relief, weigh in favor of denying this Motion.

## IV.    Defendant Is Not Entitled to Expedited Discovery.

As discussed *supra*, Defendant is not entitled to any remedy in this forum pursuant to the parties' Engagement Agreement and arbitration provision, and certainly not to pursue expedited discovery. For all the reasons addressed above, this part of Defendant's motion, too (about which counsel for Defendant never asked to meet and confer with counsel for Plaintiffs), must be denied.

## V.    Defendant's Smear Campaign Against Plaintiffs Is Untrue and Inappropriate.

Defendant's efforts here seem to be targeted at extorting Plaintiffs into capitulating to Defendant's demands by publicly filing attacks on Plaintiffs' reputation and that of CFS's principal, Mark Lanterman. This transparent effort is not worthy of being heard in this Court and is irrelevant to the Motion.

First, Defendants rely on an entirely reversed, remanded, and retried state court order from Judge Philip Bush in 2014 to suggest that the court's determinations as to Mark Lanterman's credibility in that matter and billing practices should be an issue in this case. This reliance is intellectually dishonest and inappropriate. A review of the Court of Appeals' subsequent decisions in the matter show that the Court of Appeals relied specifically on Lanterman's testimony—and credibility—in reversing that order and in affirming the second trial court's award of CFS's full invoices, attorneys' fees, costs, and pre- and post-judgment interest. Indeed, he state court opinion to which Defendant cites in *Lanterman v. Afremov* was reversed and remanded for a new trial in front of a new judge by the Minnesota Court of Appeals. *Lanterman v. Afremov*, No. A15-0729, 2016 WL 1551602, at *9 (Minn. Ct. App. Apr. 18, 2016). In reversing, the

Minnesota Court of Appeals *relied* on Lanterman's testimony—to the contrary of Defendant's assertion here that the court's factual findings were not reversed: "Lanterman's testimony established that CFS's damages from Afremov's breach of contract included lost payments for computer run-time and flat-rate fees as well as analyst time. The district court's error was not harmless." *Id*. at *8. The case was retried in 2019 before the Honorable Susan N. Burke and CFS recovered *every cent* of the fees for which it sought payment plus pre- and post-judgment interest. (*See* Lanterman Decl., Ex. 3, *CFS v. Afremov*, No. 27-CV-12-22089 (4th Jud. Dist., Minn. March 16, 2020).) Afremov, then represented by the Washington D.C. firm of Williams & Connolly, appealed. The Minnesota Court of Appeals nonetheless affirmed the judgment in its entirety. *See Lanterman v. Afremov*, No. A20-0709, 2021 WL 955943 (Minn. Ct. App. Mar. 15, 2021).

It is unclear how or why Ms. Hanlon determined herself to be relevant or useful to this dispute. What is clear is that Ms. Hanlon's credibility with respect to paying bills she owes is lacking, to say the least. A review of public filings involving Ms. Kimberly M. Hanlon confirms that she presently owes a judgment of $111,537.65 (Declaration of Amanda Jeffers, Exs. A and B). CFS's nearly decade-old invoice of approximately $2,100 is minor in comparison to other debts Ms. Hanlon has failed to pay. Moreover, CFS only had to become involved with Ms. Hanlon's business after she hired a paralegal with a felony conviction for identify theft who had been given access to sensitive client personal information, and she and her client disagreed about which of them would pay CFS's bill. (Lanterman Decl., ¶¶ 31–34.) CFS's bill (which was never paid) was minimal

22

compared to the work it did in analyzing the two hard drives at issue and quickly determining that the paralegal involved had taken copies of the data at issue. (*Id*.) Regardless, as Ms. Hanlon notes, the Minnesota Supreme Court has determined Mr. Lanterman to be of sufficient character to serve as a public member of its Lawyers Professional Responsibility Board.

The fact that Defendant has identified other billing disputes (one of which CFS never further pursued given the low dollar amount involved, and the other of which resulted in a judgment *in CFS's favor* of full invoices, attorneys' fees, costs, and interest of $1,413,800.70) is irrelevant to this action and clearly only used here as a tactic to scare Plaintiffs into giving in to Defendant's unreasonable demands; it has not succeeded.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court deny Defendant's motion in its entirety.

Dated: <u>November 9, 2022</u>      **MADEL PA**

                                      */s/ Cassandra B. Merrick*
                                      Christopher W. Madel
                                      Cassandra B. Merrick
                                      800 Pence Building
                                      800 Hennepin Avenue
                                      Minneapolis, MN 55403
                                      Phone: (612) 605–0630
                                      Fax: (612) 326–9990
                                      cmadel@madellaw.com
                                      cmerrick@madellaw.com
                                      *Attorneys for Plaintiffs*