# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Computer Forensic Services, Inc. and 360 Security Services LLC, | Case No. 22-cv-02665 (DWF/ECW) |
| Plaintiffs, | **DECLARATION OF MARK LANTERMAN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| BraunHagey & Borden LLC, | |
| Defendant. | |

I, Mark Lanterman, declare and state as follows:

1. My name is Mark Lanterman. I have personal knowledge of the facts sets forth in this Declaration, and I would competently testify as to the matters set forth herein. I am the Chief Technology Officer of Computer Forensic Services, Inc. ("CFS") located in Minneapolis, Minnesota.

## I. The BraunHagey Dispute

2. BraunHagey & Borden ("BraunHagey") is a law firm that was appointed to represent a class in a currently-pending lawsuit captioned *Spectrum Scientifics v. Celestron*, Case No. 5:20-cv-03642-EJD (N.D. Cal.) ("the Spectrum Litigation").

3. On June 1, 2021, ("BraunHagey") engaged CFS and 360 Security Services LLC ("360") to provide expert, digital forensic, and document scanning services. A true and correct copy of the parties' Engagement Agreement is attached hereto as Exhibit 1.

4. Before CFS can analyze any digital media, CFS must preserve it.

5. In connection with the Spectrum Litigation, BraunHagey and/or its client identified twenty (20) electronic devices for forensic preservation.

6. A CFS employee travelled onsite to the client's location in Bethel, Minnesota to pick-up the devices.

7. The forensic preservation process creates a duplicate copy of the devices and is an accurate representation of the data contained on them.

8. Table 1 below provides a summary of the devices received, and whether CFS was able to extract data from them.

| Device Description | Serial Number | Device Accessible |
|---|---|---|
| iMac 20in 2.16 | QP7090X7VUW | Yes |
| Quantum FireBall SE IDE | 334820362479 | Yes |
| IBM DORS-32160 SCSI | 85G3683E596700S61 | Yes |
| Conner SFP1080S SCSI | EX988X6 | No |
| Quantum ProDrive LPS SCSI | 94641013 | No |
| Quantum ProDrive ELS SCSI | 9372103B3 | No |
| Quantum ProDrive ELS SCSI | 93209033 | No |
| Quantum ProDrive LPS SCSI | 142305410899 | No |
| Mad Dog External USB 2.0 | N/A | Yes |
| WD Caviar WD400 | WMAMA43_209 | No |
| Quantum ProDrive LPS SCSI | MK1030VH039C | No |
| Unknown Drive | Unknown | No |
| MacBookPro | C02NH2JCG3QK | Yes |
| DELL PowerEdge 6300 Server | Service Tag: HGV5A | Yes |
| iPhone SE A2275 | F17CQ9KZPLJY | Yes |
| iPhone 6 A1549 | C7JNTRL9G5MG | Yes |

| | | |
|---|---|---|
| HP Prodesk 400 Tower | MXL440367X | Yes |
| IBM M Pro Tower | 23FY541 | Yes |
| Apple (Macintosh) Centris 650 Tower | FC338DOGCC5 | Yes |

*Table 1: Device Listing*

9. The inaccessible devices were physically damaged, thus making attempts to recover data from them difficult. BraunHagey advised us that several of the devices were damaged in a fire. CFS, however, was ultimately able to recover data from a number of the fire-damaged devices, as noted above.

10. In addition to the electronic sources outlined in Table 1, BraunHagey identified 48,483 pages of paper documents. These documents were subsequently scanned, enhanced, and produced to BraunHagey by 360. That is, BraunHagey is in possession of copies of all of the scanned paper documents.

11. Following the successful preservation of the accessible devices outlined in Table 1, CFS provided an estimate to Defendant for its services on or around June 14, 2021. The estimate was for 6-10 hours per device to run approximately nineteen (19) search terms across the data set, and then produce responsive materials to BraunHagey's Relativity provider. Based on the number of devices that would ultimately prove to be accessible, this estimate totaled between $21,450 and $35,750. CFS's total billing, including communications, analysis (e.g., search terms), data exports, email account preservations, iPhone repairs, and preservation costs, ultimately totaled $33,119.80.

12. Although it is not standard for CFS to do so, because BraunHagey advised that it was urgent that it receive the data, CFS remitted almost all of the data from the

preserved devices to BraunHagey before CFS received payment. That is, BraunHagey is currently in possession of nearly all of the data CFS preserved in this case.

13. Joseph Lanterman, CFS's Director of Finance, notified Hunter Thomson, an attorney at Defendant, of the pending data hosting charges on September 23, 2021. Joseph Lanterman's email stated, "Please note that CFS continues to host a significant amount of data (the forensic images) on this project. We will need to begin billing for this hosting starting Oct. 1, 2021." Mr. Thomson never responded to this email.

14. On November 17, 2021, Ron Fisher, a Partner with Defendant, advised via email that CFS must continue to store the data and could not destroy the property, despite Defendant's refusal to pay for the same. Consequently, charges for hosting continue to accrue. In total, CFS has preserved approximately 3,141 GB of data. At the agreed upon rate in the Engagement Agreement ($3.45 per GB per month), this amounts to $361.20 per diem.

15. Joseph Lanterman sent four (4) invoices on behalf of CFS and 360 to Mr. Thomson on July 7, 2021, July 27, 2021, August 4, 2021, and September 23, 2021. (On August 4, 2021, CFS sent invoices containing additional billing information to Thomson. CFS also followed up on the outstanding invoices on August 30, 2021.

16. On September 3, 2021, Mr. Thomson responded to CFS's August 30, 2021 email saying "Got it. We'll circle back with you on Tuesday." This promised follow-up by Mr. Thomson never occurred.

17. On October 8, 2021, I followed up in an email to Matthew Borden, a more senior attorney in the firm, and Mr. Thomson, asking "Why haven't [CFS and 360's] invoices been paid."

18. On October 14, 2021, I followed up again informing Mr. Borden and Mr. Thomson that "I have left messages for both of you. If I don't hear from you this week, I intend to escalate. I would appreciate a response."

19. On October 14, 2021, Mr. Borden finally responded, stating:

> Hunter has been in consistent contact with Joe Lanterman at your firm regarding these issues. […] The concern we have with the invoices is that Joe has confirmed that ComputerForensics has billed numerous hours that its computers were processing data as "analyst time." Billing computer time as analyst time is not industry standard, and our retainer agreement provides for payment for actual analyst time, not computer time. We are additionally concerned about the volume of hours billed without success in recovering any data, particularly when our subsequent vendor was able to recover data relatively quickly.

20. BraunHagey did not provide any written dispute of these charges until October 14, 2021. This was approximately 99 days after CFS's first invoice, 71 days after the second CFS invoice, and 79 days after 360's invoice.

21. Through the fall of 2021, after this communication in which BraunHagey refused to pay its invoices, I contacted BraunHagey attorneys on numerous occasions asking for them to agree to an arbitrator and an arbitration forum, including by email and by telephone. I received no response.

22. Having heard no response from anyone at BraunHagey regarding my request for arbitration under the Engagement Agreement, in November 2021, I contacted former Minnesota Supreme Court Justice James Gilbert, who I know frequently arbitrates

private disputes, inquiring whether he was available to arbitrate this dispute between the parties under the rules of the American Arbitration Association.

23. Finally, this drew a response from someone at BraunHagey, as Ron Fisher, a partner with BraunHagey, wrote back to me and Justice Gilbert's office on November 17, 2021 advising that BraunHagey would not agree to arbitrate the dispute with Justice Gilbert and that Defendant would agree to arbitrate the dispute before "JAMS or the American Arbitration Association."

24. My attorneys sent a letter to BraunHagey on December 2, 2021, again requesting that Defendant agree to arbitrate before JAMS or AAA.

25. Mr. Fisher responded to this letter on December 10, 2021, stating that Defendant was "willing to proceed to arbitration before either JAMS or the American Arbitration Association under those bodies' respective commercial arbitration rules, with the arbitrator selected in accordance with the respective rules of those arbitral bodies."

26. On May 31, 2022, consistent with Mr. Fisher's statements that BraunHagey would agree to arbitrate before AAA or JAMS, we filed our Demand for Arbitration with JAMS and served the Demand for Arbitration on BraunHagey.

27. On June 27, 2022, Mr. Fisher wrote to JAMS that BraunHagey did not agree to arbitrate the dispute with JAMS. On July 11, 2022, JAMS determined that it would not arbitrate this dispute in the absence of agreement of the parties or a court order compelling arbitration.

28. My attorneys and BraunHagey's attorney, Brendan Kennedy, continued to correspond regarding this dispute through July and August 2022. We repeatedly asked

BraunHagey to decide whether it would agree to arbitrate before AAA or JAMS, including in a phone call between counsel for the parties on July 20, 2022 and by emails between counsel for the parties on July 26, July 28, August 1, and August 12, 2022.

29. Because BraunHagey refused to agree to an arbitration forum or an arbitrator since at least November 2021, and its proposals with respect to potential arbitration were unsatisfactory and only continued the delay of this action, we filed the state court action on August 16, 2022 to petition the court to appoint an arbitrator and order BraunHagey to arbitrate. My attorney then asked BraunHagey's attorney, Mr. Kenny, whether he was authorized to accept service of the Complaint in the state court action in writing on August 16, August 17, August 23, and August 24. He finally advised he was not authorized to accept service of the Complaint in the state court action on August 24.

30. Accordingly, on August 29, 2022, pursuant to Minn. R. Civ. P. 4.05, we mailed a request for waiver of service to BraunHagey. BraunHagey waived service on September 23, 2022. It then removed the state court action to this Court on October 24, 2022.

**II.    The Hanlon Declaration**

31. I am troubled by Ms. Kimberly Hanlon's submission of a declaration in this matter. I recall Ms. Hanlon was involved in a matter CFS handled in 2013 in which a Minnesota state representative, Satveer Chaudhary, who was also a private attorney, became concerned about a paralegal Ms. Hanlon was employing who was providing services for him. Mr. Chaudhaury was a client of Ms. Hanlon's business, More Law, and

she provided him with a paralegal. Mr. Chaudhaury became concerned about the character of that paralegal, and we discovered that the paralegal had felony convictions in multiple states for identity theft. Given the paralegal's access to the private data of Mr. Chaudhaury's clients, Mr. Chaudhaury was understandably concerned. He asked us to create images of two hard drives at issue to determine the paralegal's actions taken with respect to the data on Mr. Chaudhaury's hard drives.

32. During our initial conversations with both More Law and Mr. Chaudhaury, I made it clear that the data from the two hard drives needed to be preserved in order to conduct any investigation. This is accomplished by creating what is known as a "forensic image," or evidentiary copy, of each device. In nearly all cases, the creation of a forensic image is the first step taken by a trained computer forensic examiner and is recognized by the computer forensic community as the proper way to preserve original electronic evidence. The process of creating a forensic image captures this information in its original, unmodified state. For example, computer files have system information such as when documents were created accessed or modified and also allows an examiner to determine if data has been copied to an external media. Without the creation of a forensic image, CFS would not have conducted any sort of analysis, as the creation of a forensic image protects the data. Merely turning on one of the computers would have changed the state of the evidence by altering critical date stamps and could have potentially written over and erased existing files.

33. Furthermore, the flat-rate imaging charge of $300 per device is accurately reflected within the disputed invoice, as a forensic image represents the initial work

product of CFS. As such, the data preserved within a forensic image is subject to Minn. Stat. § 514 and CFS asserted a lien on the property, the same rights it has in this matter under the terms of the Engagement Agreement. This has been affirmed by Hennepin County District Judge John Q. McShane (*Extrusion Dies Industries, LLC et al., v. Computer Forensic Services, Inc. et al.*, 4th Jud. Dist., Minn., Court File No. 27-CV-09-6284, Aug. 18, 2009). A true and correct copy of that opinion is attached hereto as Exhibit 2. I brought this law to Ms. Hanlon's attention via e-mail on January 13, 2014.

34. Later, CFS was asked to perform analysis of the provided data. This effort was aimed at determining whether this More Law employee stole privileged data of Mr. Chaudhary. During our initial phone calls, both More Law and Mr. Chaudhary had agreed that payment of CFS's fees would be made by More Law. CFS performed that analysis and provided, upon their request, a verbal report and supporting documentation to Mr. Chaudhary and More Law. In summary, the results of the analysis indicated that the More Law employee with multiple felony convictions for identify theft in several states used Dropbox and a USB thumb drive to steal Mr. Chaudhary's clients' confidential information from the systems. As a result of these requests, CFS prepared and issued to More Law invoice #4903. After more than 90 days of being past due, CFS reached out to both More Law and Mr. Chaudhary to request payment, at which time CFS was told by Bill Hanlon of More Law that "We [More Law] are currently not in a position financially to pay anything on that invoice at this time. I would like to set up a payment schedule for payments starting in March. I realize that seems like a long time to wait, but the funds will not be available before then." This request for a payment plan

was not discussed until their invoice was long past due and they had already received the benefit of our work. While I continued to request payment, ultimately other matters of importance took precedence for my active clients and given More Law's inability to pay, I determined that it was not worth my time pursuing payment of a bill totaling $2,062.50. Ms. Hanlon seems to suggest that her unfounded threats of criminal action against CFS and communications to the Minnesota Attorney General's Office stopped my efforts to collect on the debt owed by More Law. This is false. Indeed, the Attorney General's Office reached out to me, and I responded explaining the situation. The attorney I spoke with in that office advised via phone that she was simply trying to help Ms. Hanlon. I never heard further from the Attorney General's Office after sending my letter response in January 2014.

### III. The Afremov matter

35. I also wish to correct another false accusation that BraunHagey has made about me. BraunHagey suggests that my billing practices were the subject of judicial rebuke and have been determined to lack credibility, citing to a Minnesota state court case from 2014 by now-retired Judge Philip Bush. The opinion to which they cite was reversed and remanded for a new trial in front of a new judge, the Honorable Susan Burke, by the Minnesota Court of Appeals. *Lanterman v. Afremov*, No. A15-0729, 2016 WL 1551602, at *9 (Minn. Ct. App. Apr. 18, 2016). In reversing, the Minnesota Court of Appeals relied on my testimony: "Lanterman's testimony established that CFS's damages from Afremov's breach of contract included lost payments for computer run-time and flat-rate fees as well as analyst time. The district court's error was not harmless." The

case was retried in 2019 and CFS recovered every cent of the fees for which CFS sought payment plus pre- and post-judgment interest. A true and correct copy of the order denying the defendant's motion for a new trial, *CFS v. Afremov*, No. 27-CV-12-22089 (4th Jud. Dist., Minn., May 7, 2020), is attached hereto as Exhibit 3. The Minnesota Court of Appeals then affirmed that judgment in its entirety in 2021. *See Lanterman v. Afremov*, No. A20-0709, 2021 WL 955943 (Minn. Ct. App. Mar. 15, 2021). The judgment in that action was for $1,413,800.70, a true and correct copy of the public record for which is attached hereto as Exhibit 4.

36. I find it unusual and disconcerting that BraunHagey attacks my credibility and the credibility of CFS in this manner when its counsel in this action, Hellmuth & Johnson PLLC, has engaged CFS on numerous occasions for its clients, including one in August of this year, after BraunHagey engaged Hellmuth & Johnson PLLC in this dispute.

37. The outstanding balance owed by BraunHagey to CFS and 360 as of November 3, 2022 is $201,782,70.

I declare under penalty of perjury that everything I have stated in this document is true and correct.

Executed in Hennepin County, Minnesota.

Dated: November 9, 2022

_____
Mark Lanterman